IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Case No. 12-11926-DD

THOMAS OTTER ADAMS AND RICKY KNIGHT, ET AL.,

Plaintiffs-Appellants,

v.

LESLIE THOMPSON AND ALABAMA DEP'T. OF CORRECTIONS, ET AL.,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**BRIEF OF PLAINTIFFS-APPELLANTS**

Mark Sabel
Sabel Law Firm, L.L.C.
P.O. Box 231348
Montgomery, AL 36123
(334) 546-2161

Peter Fruin
Maynard, Cooper & Gale, P.C.
Suite 2400, 1901 6th Avenue N
Birmingham, AL 35203
(205) 254-1000

Case No. 12-11926-DD

_____*Adams and Knight v. Alabama Dep't of Corrections, et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, counsel hereby certifies that the following persons or entities have or may have an interest in the outcome of this case:

1.    Plaintiff-Appellant Thomas "Otter" Adams

2.    Judge Harold Albritton, U.S. District Judge, Middle District of Alabama

3.    Defendant-Appellee Tom L. Allen

4.    American Civil Liberties Union of Alabama

5.    Amin Aminifar, Esq., United States Dep't. of Justice, Civil Rights Division

6.    Samuel R. Bagenstos, Esq., Principal Deputy Assistant Attorney General, United States Dep't. of Justice, Civil Rights Division

7.    Plaintiff-Appellant Douglas (Dark Horns) Bailey

8.    George Beck, Esq., United States Attorney, Middle District of Alabama

9.    Defendant-Appellee Governor Robert Bentley, Governor of the State of Alabama

10.    Defendant-Appellee, Chaplain James Bowen

C-1

*Adams and Knight v. Alabama Dep't of Corrections*; Docket No. 12-11926-DD

11.    Defendant-Appellee Eddie Carter

12.    Defendant-Appellee Chaplain Coley Chestnut

13.    Plaintiff-Appellant Michael Clem

14.    Judge Charles Coody, U.S. Magistrate Judge, Middle District of Alabama

15.    Defendant-Appellee Warden Dees

16.    Dodson & Steadman, P.C., counsel for Defendants-Appellees

17.    James Dubois, Esq., Assistant United States Attorney, Middle District of Alabama.

18.    Defendant-Appellee Roy Dunaway

19.    Defendant-Appellee DeWayne Estes

20.    Deena Fox, Esq., United States Dep't. of Justice, Civil Rights Division

21.    Peter Fruin, Esq., counsel for Plaintiffs-Appellants

22.    Defendant-Appellee J.C. Giles

23.    Defendant-Appellee Thomas Gilkerson

24.    Roy Haber, Esq., counsel for Plaintiffs-Appellants

25.    Defendant-Appellee Michael Haley, former Commissioner of Alabama Department of Corrections

26.    Anne Hill, Esq., General Counsel, Alabama Dep't. of Corrections

*Adams and Knight v. Alabama Dep't of Corrections*; Docket No. 12-11926-DD

27.  Defendant-Appellee Warden Lynn Harrelson

28.  Defendant-Appellee Tommy Herring

29.  Defendant-Appellee Roy Hightower

30.  Defendant-Appellee Warden Ralph Hooks

31.  Plaintiff-Appellant Franklin "Running Bear" Irvin

32.  Defendant-Appellee Willie Johnson

33.  Plaintiff-Appellant Billy "Two Feathers" Jones

34.  Plaintiff-Appellant Ricky Knight

35.  Defendant-Appellee Chaplain Bill Lindsey

36.  Preston Martin, Esq., counsel for Plaintiffs-Appellants

37.  Maynard, Cooper, & Gale, P.C., counsel for Plaintiffs-Appellants

38.  Defendant-Appellee James McClure

39.  Defendant-Appellee Billy Mitchem

40.  Defendant-Appellee Warden Gwyn Moseley

41.  Timothy D. Mygatt, Esq., United States Dep't. of Justice, Civil Rights Division

42.  Native American Prisoners of Alabama (& Turtle Wind Clan)

43.  Defendant-Appellee Deputy Warden Darrell Parker

C-3

*Adams and Knight v. Alabama Dep't of Corrections*; Docket No. 12-11926-DD

44.     Defendant-Appellee Kenneth Patrick

45.     Thomas E. Perez, Esq., Assistant Attorney General, United States Dep't. of

Justice, Civil Rights Division

46.     Defendant-Appellee Andrew W. Redd, Esq., Former General Counsel,

Alabama Dep't. of Corrections.

47.     Defendant-Appellee Neal W. Russell

48.     Defendant-Appellee William S. Sticker

49.     Mark Sabel, Esq., counsel for Plaintiffs-Appellants

50.     Sabel Law Firm, L.L.C., counsel for Plaintiffs-Appellants

51.     Defendant-Appellee John Michael Shaver

52.     Plaintiff-Appellant Timothy Grey Wolf Smith

53.     Defendant-Appellee State of Alabama, Department of Corrections

54.     Joe Steadman, Esq., counsel for Defendants-Appellees

55.     Defendant-Appellee Luther Strange, Esq., Attorney General, State of

Alabama

56.     Defendant-Appellee Ron Sutton

57.     Defendant-Appellee Morris Thigpen

58.     Kim Thomas, Esq., Commissioner, Alabama Dep't. of Corrections

*Adams and Knight v. Alabama Dep't of Corrections*; Docket No. 12-11926-DD

59.    Defendant-Appellee Leslie Thompson

60.    United States Department of Justice, Civil Rights Division

61.    United States of America

62.    Defendant-Appellee Chaplain Steve Walker

63.    Defendant-Appellee J.D. White

64.    Defendant-Appellee Chaplain Willie Whiting

65.    Defendant-Appellee Officer Wynn


Respectfully submitted this the __6th__ day of August, 2012.


 /s/ Mark Sabel_____
MARK SABEL, SAB004
Attorney for Plaintiffs-Appellants

C-5

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument to address matters of fundamental importance to the practice of traditional Native American religion and to provide assistance to the Court's consideration of this cause. This matter is a concern of the highest order for traditional Tribal people. As one of Appellants' acclaimed experts, anthropologist Deward Walker, testified: "Hair, which is closely connected to a Native American's innermost being and cultural identity, has great religious significance for *all* Tribes. Hair is a central aspect of one's person, constitutes part of one's identity as an Indian person, and is a necessary element in Native American religious practice." *See* R471- PEX 2 at 1, ¶4 (Dr. Walker Report) (emphasis added).[1] In addition, oral argument could assist the Court in sifting the voluminous record, generated by litigation that has spanned decades.

## CERTIFICATE OF TYPE SIZE AND STYLE

This brief utilizes 14 point Times New Roman.

---

[1]Throughout this Brief, the Exhibits submitted in the 2009 trial of this cause will be cited to Document 471. Document 471 represents the "Minute Entry Proceedings," whose substance and attachments are unavailable to the attorneys in this cause, but should be available to this Court, per a conversation with a Clerk of the Middle District. The undersigned has called the courtroom deputy entrusted to properly log the filing of exhibits with the district court, but she has not returned the undersigned's calls. Because Document 471 includes the Parties' exhibit lists as attachments, this is the most logical location for a record citation.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . .  i

CERTIFICATE OF TYPE SIZE AND STYLE. . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

TABLE OF RECORD REFERENCES IN BRIEF. . . . . . . . . . . . . . . . . . . . . . x

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xiv

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      I.     The Course of Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      II.    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      III.   Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      I.     The Total Ban on Wearing Long Hair Violates Plaintiffs' RLUIPA
            Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           A.    ADOC failed to demonstrate it actually considered less
                restrictive means than requiring all Native Americans to submit
                to hair cuts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

B.    The lower court erred in dismissing the significance of other well-run prison systems.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

C.    The magistrate failed to interpret RLUIPA broadly in favor of religious protection.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

E.    The magistrate erred in not finding the ban on kouplocks to be unlawful.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.    There are no interests materially furthered by precluding long hair that cannot be protected by a less restrictive means.. . . . . . . . . . . . 25

A.    The finding that inmates were "younger, bolder, and meaner" is irrelevant and clearly erroneous.. . . . . . . . . . . . . . . . . . . . . . 25

B.    Hair Pulling.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.    Identification.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

D.    Hygiene, health and sanitation.. . . . . . . . . . . . . . . . . . . . . . 34

1.    The Alaska example.. . . . . . . . . . . . . . . . . . . . . . 35

2.    The magistrate improperly invokes judicial notice.. . . 38

E.    Preventing Gang Activity.. . . . . . . . . . . . . . . . . . . . . . . . . 40

F.    Contraband.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

G.    Uniformity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

H.    National corrections expert Sullivan, whom the lower court ignored, addressed ADOC's staffing claims, which undermined rather than furthered ADOC's position.. . . . . . . . . . . . . . . . . 46

I.      Permitting women to wear long hair demonstrates ADOC can safely and securely grant a religious hair length exemption. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

III.    Evidentiary Errors Require Reversal... . . . . . . . . . . . . . . . . . . . . . . . 62

A.      The magistrate's failure to weigh or consider the testimony of Plaintiffs' experts requires reversal... . . . . . . . . . . . . . . . . . . 62

B.      Plaintiffs' arbitrarily ignored experts prove a RLUIPA violation; ADOC's expert does not assist the court.. . . . . . . . . 64

        1.      ADOC's Experience Deficit. . . . . . . . . . . . . . . . . . . . 64

        2.      Angelone could not demonstrate a causal relationship between the purported restoration of order in Virginia's system and his hair cut policy, and could point to no facts suggesting a causal relationship between Alabama's hair cut policy and the good order of its prisons.. . . . . 65

        3.      The violence, riots, and overall chaos permeating the Virginia system are unheard of in the Alabama DOC, rendering the Virginia experience wholly irrelevant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

        4.      Angelone's testimony is unhelpful, and cannot carry ADOC's burden... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

C.      The magistrate committed other evidentiary errors.. . . . . . . . 71

IV.     The hair length restrictions violate additional legal rights of Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

# TABLE OF CITATIONS

## Cases

*Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974) . . . . . . . . . . . . . . 32

*Rouser v. White,* 630 F. Supp. 2d 1165 (E.D. Cal. 2009). . . . . . . . . . . . . . . . . . . 33

*Brock v. United States*, 387 F.2d 254 (5th Cir. 1967).. . . . . . . . . . . . . . . . . . . . . 62

*Brown v. Plata*, 131 S. Ct. 1910 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Clark v. Jeter*, 486 U.S. 456 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Cruz v. Beto*, 405 U.S. 319, 92 S. Ct. 107 (1972). . . . . . . . . . . . . . . . . . . . . . . . 73

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Hamilton v. Schriro*, 74 F.3d 1545, 1552 (8th Cir.), *cert. denied*, 519 U.S. 874 (1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

*West v. Virginia Dept. of Corrections*, 847 F. Supp. 402 (W.D. Va. 1994) . . . . . 72

*Wisconsin v. Yoder*, 406 U.S. 205 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*American Milling Co. v. Trustee of Distribution Trust*, 623 F.3d 570 (8th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001), *cert. denied*, 537 U.S. 812 (2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 124 S. Ct. 2783 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*\*Benning v. Georgia*, 2012 WL 1862339 (M.D. Ga. May 23, 2012).. . . . . . . . . 24

*Brunskill v. Boyd*, 141 Fed. Appx. 771 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . 21

*Cordovan Assocs., Inc. v. Dayton Rubber Co.*, 290 F.2d 858 (6th Cir. 1961). . . . . 5

*Couch v. Jabe*, 679 F.3d 197 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Craig v. Boren*, 429 U.S. 190, 97 S. Ct. 451 (1976) . . . . . . . . . . . . . . . . . . . . . . . 61

*Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872 (1990) . . . 19

*Frontiero v. Richardson*, 411 U. S. 677 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Gartrell v. Ashcroft*, 191 F. Supp. 2d 23 (D. D.C. 2002), *appeal dismissed*, 2003 WL 1873847 (D.C. Cir. Apr. 11, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal U.S.,* 546 U.S. 418, 126 S. Ct. 1211 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17-19, 48, 56, 66

*Harris v. Chapman*, 97 F.3d 499 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . 18, 19

*Houck v. Hinds*, 215 F.2d 673 (10th Cir. 1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Johnson v. Collins*, 2009 WL 1543811 (N.D. Ohio June 2, 2009). . . . . . . . . . . . 20

*Jova v. Smith*, 582 F.3d 410 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Laube v. Haley*, 242 F.Supp.2d 1150 (M.D. Ala. 2003) . . . . . . . . . . . . . . . . . . . . 54

*Lawrence v. Commodity Futures Trading Commission*, 759 F.2d 767 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Long v. Robinson,* 432 F.2d 977 (4th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Matter of Missionary Baptist Foundation of Amer., Inc.*, 712 F.2d 206 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Odneal v. Pierce*, 2009 WL 901511 (5th Cir. Apr. 3, 2009). . . . . . . . . . . . . . . . . 24

*Odneal v. Pierce*, 2010 WL 3359535 (S.D. Tex. 2010). . . . . . . . . . . . . . . . . . . . 24

*\*Pittman v. Gilmore*, 556 F.2d 1259 (5th Cir. 1977). . . . . . . . . . . . . . . . . . . . 33, 62

*Procunier v. Martinez*, 416 U.S. 396 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Putzer v. Donnelly*, 2010 WL 2545566 (D. Nev. 2010). . . . . . . . . . . . . . . . . . . 16

*Reynolds v. McInnes*, 338 F.3d 1201 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . 5

*Schlesinger v. Ballard*, 419 U.S. 498, 95 S. Ct. 572 (1975) . . . . . . . . . . . . . . . . 61

*Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 33

*Smith v. Allen*, 502 F.3d 1255 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 72

*Smith v. Ozmint*, 578 F.3d 246 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . 10, 55

*\*Spratt v. Rhode Island Dep't of Corrections*, 482 F.3d 33 (1st Cir. 2007). . . . 9-11,
14

*Thelma C. Raley, Inc. v. Kleppe*, 867 F.2d 1326 (11th Cir. 1989).. . . . . . . . . . . . . 5

*Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254 (1987). . . . . . . . . . . . . . . . . . . 10, 18

*Vester v. Asset Acceptance*, *L.L.C.*, 2009 U.S. Dist. LEXIS 81690 (D. Colo. 2009)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*\*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005). . . . . . . . . . . . 9, 22, 55, 57

*Washington v. Klem*, 497 F.3d 272 (3d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 9

**Federal Statutes**

28 U.S.C. §§2201 & 2202, Declaratory Judgment Act. . . . . . . . . . . . . . . . . . . . xiv

42 U.S.C. §§1983 & 1985. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

28 U.S.C. §1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

28 U.S.C. §1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

42 U.S.C. §2000bb-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 56

*42 U.S.C. §2000cc, *et. seq.*, Religious Land Use and Institutionalized Persons Act ("RLUIPA"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

42 U.S.C. §§ 2000cc-1; 2000cc-5(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

American Indian Religious Freedom Act, 42 U.S.C. § 1996. . . . . . . . . . . . . . . . 72

**Federal Rules**

F.R.E. 201(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fed. R. Civ. P. 52.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federal Rule of Appellate Procedure 4(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . xiv

**Federal Regulations**

28 C.F.R. §551.4 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Treatises and Other Materials**

## TABLE OF RECORD REFERENCES IN BRIEF

R471-1.    PEX A - VITA of DEWARD WALKER                *Passim*

2.    PEX B - REPORT of DEWARD WALKER

3.    Defendants' Answers to Plaintiffs' Requests

for Admissions.

4.    VITA of George Sullivan

5.    Report of George Sullivan

6.    Statement of Valerie Downes

7.    Photos Changed of Bailey by Valerie Downes

8.    Video referenced by George Sullivan

9.    Plaintiffs' Answers to Interrogatories of Jones

10.    Plaintiffs' Answers to Interrogatories of Limbaugh

11.    Plaintiffs' Answers to Interrogatories of Irvin

12.    Plaintiffs' Answers to Interrogatories of Clem

13.    Plaintiffs' Answers to Interrogatories of Bailey

14.    Plaintiffs' Answers to Interrogatories of Knight

15.    Plaintiffs' Answers to Interrogatories of Smith

16.    Plaintiffs' Answers to Interrogatories of Adams

17.    Additional Stipulations of Plaintiffs

18. American Correctional Association, ACA Standard 4-4283, "Freedom in Personal Grooming."

19. Alabama's Hair Length Policy (Inmate Handbook #102).

20. Prison Grooming Survey (Robert L. Smith)

21. Deposition of Robert L. Smith (describing his preparation of the prison survey)

22. Summary of States Allowing Religious Exemptions to Grooming Policy

23. Updated Prison Grooming Survey and/or Summary

24. Grooming/Identification Policies of State of Alaska

25. Grooming/Identification Policies of State of Arizona

26. Grooming/Identification Policies of State of California

27. Grooming/Identification Policies of State of Colorado

28. Grooming/Identification Policies of State of Delaware

29. Grooming/Identification Policies of District of Columbia (Program Statement 4010.2C).

30. Grooming Policy Statement of State of Hawaii

31. Grooming/Identification Policies of State of Idaho

32. Grooming/Identification Policies of State of Illinois

33.    Grooming/Identification Policies of State of Indiana

34.    Grooming/Identification Policies of State of Iowa

35.    Grooming/Identification Policies of State of Kansas

36.    Grooming/Identification Policies of State of Kentucky

37.    Grooming/Identification Policies of State of Maryland (in Maryland
       Inmate Handbook)

38.    Grooming/Identification Policies of State of Michigan

39.    Grooming/Identification Policies of State of Minnesota

40.    Grooming/Identification Policies of State of Montana

41.    Grooming/Identification Policies of State of Nebraska

42.    Grooming/Identification Policies of State of Nevada

43.    Grooming/Identification Policies of State of New Jersey

44.    Grooming/Identification Policies of State of New Mexico

45.    Grooming/Identification Policies of State of New York

46.    Grooming/Identification Policies of State of North Dakota

47.    Grooming/Identification Policies of State of Ohio

48.    Grooming/Identification Policies of State of Oklahoma

49.    Grooming/Identification Policies of State of Oregon

50.    Grooming/Identification Policies of State of Pennsylvania

51.    Grooming Policy of State of South Dakota (Inmate Living Guide).

52.    Grooming/Identification Policies of State of Tennessee

53.    Grooming/Identification Policies of State of Washington

54.    Grooming/Identification Policies of State of Wisconsin

55.    Grooming/Identification Policies of State of Wyoming

56.    Defendants' Answers to Request for Production, Selected
       Responses/Answers, including re: digital photographs.

57.    Various Inmate Store/Canteen Lists

58.    Alabama Admin. Reg 313 (Chaplain Services and Religious
       Activities)

59.    Alabama Admin. Reg 333 (Religious Program Services)

60.    Alabama Admin. Reg 460 (Faith/Character Based Programs)

61.    Alabama Admin. Reg 032 (Inmate Identification Cards).

62.    Alabama Admin. Reg 336 (Searches)

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §1331, because the suit arises under federal law, *i.e.*, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §2000cc, *et. seq.*, and various constitutional and statutory provisions. *See*, *e.g.*, 42 U.S.C. §§1983 and 1985. Jurisdiction was also pursuant to 28 U.S.C. §1343, and 28 U.S.C. §§2201 and 2202 (Declaratory Judgment Act).

This Court has appellate jurisdiction under 28 U.S.C. §1291 because this is a timely appeal from a final judgment that disposed of all claims of all parties. The District Court entered final judgment on March 8, 2012. (R-550). Notice of appeal was timely filed on April 6, 2012. (R-556). Accordingly, this appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A). Before the District Court's final judgment, there had been a Recommendation by the magistrate judge (R-530, July 11, 2011), adopted in full by the lower court's Order of March 8, 2012. (R-549). Plaintiffs timely objected to the magistrate's Recommendation (R-539), thus preserving their arguments for review in this Court.

## STATEMENT OF THE ISSUES

1.    Whether the ADOC's failure to consider or examine the established, easily accessible less restrictive hair length policies and procedures of over 40 United States prison jurisdictions, as well as those of its own women's prisons, requires reversal?

2.    Whether the ADOC presented sufficient evidence to carry its RLUIPA burden of demonstrating that it could not accommodate at any of its men's facilities or for any of the non-maximum security Plaintiffs any religious exemption to its hair length requirement, including for the wearing of a thin strip of long hair called a kouplock?

3.    Whether the lower court erred in giving undue deference to the willfully uninformed opinions of ADOC corrections officials while impermissibly ignoring the workability of the practices of most North American prison systems; failing to consider or even weigh the often uncontradicted testimony of Plaintiffs' security expert and the uncontradicted testimony of Plaintiffs' identification expert; failing to properly apply RLUIPA or consider the additional claims; and making multiple evidentiary errors?

## STATEMENT OF THE CASE

### I.    The Course of Proceedings

The most pertinent recent proceedings in this longstanding cause occurred after this Court remanded this matter for trial on the issue of hair length, (R436), whereupon a trial was conducted without consent before a magistrate judge. The magistrate considered only RLUIPA claims, recommending the denial of all relief. (R530).  Plaintiffs' timely filed objections to the magistrate's recommendation were overruled in a short opinion by the district judge, (R549), who in large measure rubber-stamped the "findings" and recommendation of the magistrate, and issued a final judgment.  (R550).  This appeal ensued.

### II.    Statement of Facts

Plaintiffs are sincere practitioners of traditional Native American spirituality, R530-9, seeking a religious exemption from Alabama's hair length requirement that applies to all male inmates without a medical exemption regardless of security level, institutional assignment or institutional record.  R471-PEX 19.  No Plaintiff is a maximum security offender, nor is any Plaintiff currently assigned to a maximum security facility.  R471- PEXs 9-16.   The hair length requirement does not apply to Alabama's incarcerated women offenders, regardless of security level, institutional assignment or institutional record.  R471-

2

PEX 19.  All Plaintiffs seek to wear their hair in the traditional, unshorn manner; three Plaintiffs alternatively seek to wear a kouplock, which is a two-inch wide strip of hair beginning at the base of the skull and stretching down the back. (R471- PEXs 9 & 11 at pg. 4; PEX 15 at 3).

Most male inmates incarcerated in the United States are permitted to wear long hair, the presumptive procedure for sound correctional management for decades.  (R471-PEX18, American Correctional Association Standard 4-4283 ("Freedom in Personal Grooming")); (R471-PEXs 22-23 (documenting jurisdictions with hair length exemptions). The forced cutting of hair, particularly over religious objections, violates widely accepted corrections standards for maintaining well-run prisons, including because, among other things, it breeds resentment and hostility, and in this case, infringes the human need for fulfilling a core religious tenet.  *See* PEX 2 at 2, ¶7 (Dr. Walker Report) ("It is well documented that the involuntary cutting of long hair has had adverse psychological effects on Native Americans, including by causing depression, anxiety, resentment, anger, hostility, and anger in those whose hair is cut.").

Despite multiple less restrictive models to control for Alabama's post-hoc reasons for long hair, ADOC never considered any.  Nor did ADOC ever consider applying its own practices related to women to men.  The lower court likewise

declined to consider "prisons in other places," (R530 at 25), dismissing the

prevalence of less restrictive practices as "beside the point." (R549 at 2).

The lower court likewise left unmentioned and unweighed the testimony of

national corrections consultant George Sullivan, who served on the professional

committee evaluating the recommended, prevalent correctional practice of

permitting unshorn hair. R471- PEX 5, ¶10-11. Grounding his testimony in

experience over five decades, he testified to the steps multiple institutions take to

control for the stated concerns of ADOC. *Id.* at pgs. 10-14. Sullivan testified that

overcrowding or understaffing, if demonstrated, was unrelated to ADOC's ability

to search hair, *id.* at 14, and Plaintiffs confirmed that ADOC was already

searching their hair. (R474-Tr. (Clem and Irvin)). According to the unmentioned

and unweighed testimony of George Sullivan, if ADOC is searching inmates,

ADOC is able to search hair. Neither the ADOC nor the trial court considered or

evaluated alternative policies as less restrictive means.

## III.    Standard of Review

Applying the least restrictive means prong of RLUIPA raises an issue of

statutory construction, which is subject to *de novo* review. *See Hamilton v.*

*Schriro*, 74 F.3d 1545, 1552 (8th Cir.), *cert. denied*, 519 U.S. 874 (1996) (RFRA

4

case).  Moreover, although this Court generally reviews findings of fact under a

"clearly erroneous" standard (*see* Fed. R. Civ. P. 52(a)(6)), as discussed more fully

*infra*, many determinations that the magistrate denominated as findings of fact are

actually either conclusions of law or mixed findings of fact and conclusions of

law.  This Court reviews those determinations *de novo*.  *See Cordovan Assocs.,*

*Inc. v. Dayton Rubber Co.*, 290 F.2d 858, 860 (6th Cir. 1961) (finding designated

as finding of fact that is not in reality a finding of fact, but is a conclusion of law

or a mixed finding of fact and conclusion of law, is not binding on appellate

court); *see also Houck v. Hinds*, 215 F.2d 673, 676 (10th Cir. 1954) (conclusion of

law or conclusion upon mixed question of law and fact will be treated as such

even though designated by trial court as a finding of fact); *Reynolds v. McInnes*,

338 F.3d 1201, 1211 (11th Cir. 2003) (mixed questions of law and fact are

reviewed *de novo*).

Even if the Court concludes that some of those determinations are findings

of fact subject to review under the "clearly erroneous" standard, Appellants still

prevail. A finding of fact is clearly erroneous if the record lacks substantial

evidence to support it. *Thelma C. Raley, Inc. v. Kleppe*, 867 F.2d 1326, 1328 (11th

Cir. 1989). The record here lacks substantial evidence to support the lower court's

findings.  Moreover, "[w]hen a finding of fact is premised on an improper legal

standard, or a proper one improperly applied, that finding loses the insulation of the clearly erroneous rule." *Matter of Missionary Baptist Foundation of Amer., Inc.*, 712 F.2d 206, 209 (5th Cir. 1983).

## SUMMARY OF ARGUMENT

The lower court gave no consideration to the time-tested practices of well run prison systems around the country, not only completely dismissing their relevance but refusing to even weigh or consider the expert opinion of Plaintiffs' national corrections expert who testified at length about the positive security benefits of permitting hair length exemptions. The ADOC never once considered the alternatives offered by 41 different prison systems, nor did the lower court require that ADOC do so.

ADOC does not require women in its custody to adhere to short hair requirements. ADOC offered a number of archaic reasons for this rule, but the fact is that women offenders were not shown to present materially different security concerns from men. ADOC assumes that cutting women's hair would cause psychological harm, and the undisputed evidence is that cutting Native Americans hair has an identical if not more pronounced adverse effect.

For American Indians, wearing long hair in the traditional manner is a religious interest of the highest order, a finding stated but not adequately weighed or balanced below. The myriad evidentiary errors require reversal, especially the failure to mention or weigh the testimony of Plaintiffs' immensely qualified security expert, a witness possessing extensive experience across decades promulgating and maintaining inmate grooming standards and procedures.

There was insufficient evidence to support the magistrate's upholding Alabama's broad ban on long hair and refusal to even consider a religious exception to the hair length requirement.  Misapplying RLUIPA, the magistrate impermissibly shifted the burden of proof away from the Defendants, who are obligated to demonstrate with evidence that they are too incompetent to accommodate the wearing of long hair even though long hair is permitted in Alabama's women's facilities and in over 40 different prison systems for men, including the BOP.  Additionally, the magistrate did not consider Plaintiffs proposed less restrictive alternatives, such as the proposal by three Plaintiffs that they be permitted to wear a kouplock, which is a two-inch wide strip of hair beginning at the base of the skull, stretching down the back, and presenting no conceivable security issues.

7

The record highlights the undeniable workability of hair length exemptions. *See, e.g.,* R471- PEX 23 (grooming survey reveals 40 jurisdictions not requiring hair cuts); PEX 22 (summary of state prison systems allowing religious exemptions to grooming requirements); PEX 18 (ACA policy establishing "freedom in personal grooming" as the national standard); PEX 24-55 (policies of selected state correctional systems permitting long hair). Each of these systems competently administers hair length exemptions despite overcrowding and understaffing, and controls for all of the hypothesized difficulties conjured by ADOC.

Alabama officials freely admitted that they never considered any type of hair length exemption or the grooming policy of any other state or federal prison. ADOC's retained expert had never even heard of a religious hair length exemption. The lower court likewise declined to consider "prisons in other places," (R530 at 25-Magistrate's Recommendation), dismissing the prevalence of less restrictive practices as "beside the point." (R549 at 2-District Judge). This failure to consider and evaluate the ability of other prison systems to accommodate the Native American religious practice of wearing unshorn hair in and of itself requires reversal.

**ARGUMENT**

8

**I.    The Total Ban on Wearing Long Hair Violates Plaintiffs' RLUIPA Rights.**

**A.    ADOC failed to demonstrate it actually considered less restrictive means than requiring all Native Americans to submit to hair cuts.**

RLUIPA requires prison officials to show that they have "actually considered and rejected the efficacy of less restrictive measures." *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005); *accord Couch v. Jabe*, 679 F.3d 197, 204 (4th Cir. 2012) (remanding for consideration of necessity of beard length restrictions); *Jova v. Smith*, 582 F.3d 410, 416 (2d Cir. 2009); *Washington v. Klem*, 497 F.3d 272, 284 (3d Cir. 2007); *Spratt v. Rhode Island Dep't of Corrections*, 482 F.3d 33, 40–41 (1st Cir. 2007) (blanket assertion that alternatives are unfeasible does not meet officials' burden); *Gartrell v. Ashcroft*, 191 F. Supp. 2d 23, 39–40 (D.D.C. 2002), *appeal dismissed*, 2003 WL 1873847 (D.C. Cir. 2003). The ADOC admittedly did not consider alternatives or less restrictive means in this case.

9

RLUIPA differs from the reasonable relationship standard, which the Supreme Court has said "is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90–91. Under RLUIPA, the existence of less restrictive practices at other institutions (or with respect to other prisoners in the same institution) are important considerations. [2]

Under RFRA/RLUIPA, the alternatives that must be considered include granting religious exemptions from otherwise valid rules and policies. *See Gonzales*, 546 U.S. at 430–32 (requiring exemption from controlled substance statute for religious group that used a Schedule I drug sacramentally; under RFRA, government cannot merely "echo[] the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions."); *Smith v. Ozmint*, 578 F.3d 246, 253 (4th Cir. 2009) (prison officials failed to show why short hair requirement must be uniform); *Gartrell v. Ashcroft*, 191 F. Supp. 2d at 38–40 (requiring officials to exempt prisoners with religious

---

[2]*Warsoldier v. Woodford*, 418 F.3d at 1000; *accord*, *Jova v. Smith*, 582 F.3d 410, 416 (2d Cir. 2009); *Spratt v. Rhode Island Dep't of Corrections*, 482 F.3d at 42 (evidence of policies at one prison requires explanation from officials as to why they won't work at the prison under suit).

objections to cutting hair from transfer to a prison system which forbade long hair).

A prison system "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005). "[T]o meet the least restrictive means test, prison administrators generally ought to explore at least some alternatives, and their rejection should generally be accompanied by some measure of explanation. A blanket statement that all alternatives have been considered and rejected, such as the one here, will ordinarily be insufficient." *Spratt*, 482 F.3d 33, 41 n.11 (1st Cir. 2007).

But the ADOC admittedly explored no alternatives. National corrections consultant George Sullivan testified that the review of the policies and procedures of other well run prisons is "elementary and basic" to informing the practices of contemporary corrections professionals. (Tr. II, Sullivan Test. at 134, ln20 - 135, ln 6); (*id.* at 133, ln 20 - 134, ln 9) (revealing that Sullivan was familiar with and had reviewed all of the regulations). But no ADOC official ever reviewed, evaluated or even considered the many alternatives as practiced by well-run prisons across the continent. (Tr. II. Moseley Test. at 10, lns 9-15; *id.* at 37, ln16 -

38, ln 1; Tr. II, Patterson Test. at 103, ln 25 - 104, ln 25).  None of them reviewed the ACA standards, the BOP regulations, or the policies or procedures of other prison systems that permit long hair.  *Id*.

Similarly, the testimony of ADOC's retained expert Ronald Angelone was unhelpful and could not assist the court because, among other things, he had never reviewed the hair length policies of any states which permit hair length exemptions for religious reasons.  (R475-Tr. II at 66, lns. 19-22).  Between the time of his deposition and the time of trial, Angelone did not investigate whether any states had religious exemptions for long hair, and at trial he was unaware that several states did have some exemptions. Tr. II at 66, lns. 23-25. Beyond that, Angelone, like every Alabama official who testified, *had not reviewed even a single hair length policy from a state prison system or from the federal prison system that permitted wearing long hair*.  (R475-Tr. II at 67, lns. 15-18).  The defense witnesses were therefore without any basis in fact to assert the complete absence of any means less restrictive than a hair cut requirement.

Because no Alabama official had any familiarity with the policies of prison systems that permit the wearing of long hair, ADOC had no basis to state that less restrictive means to address their stated concerns did not exist.  Without such necessary information or experience, ADOC officials were unable to exercise

12

discretion or judgment. Accordingly, the magistrate erred in unduly deferring to ADOC's unfounded positions, as the magistrate repeatedly confirmed doing.

As in *Warsoldier*, "[ADOC] cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier*, 418 F.3d at 999. Because ADOC did not examine whether or not the grooming policy could accommodate religious beliefs at the time of its adoption, it cannot carry its burden to demonstrate that there is no less restrictive means to satisfy its stated interests. The magistrate erred by disregarding those basic principles.

**B.    The lower court erred in dismissing the significance of other well-run prison systems.**

The court below erroneously narrowed its inquiry exclusively to Alabama, refusing to examine policies or practices of "prisons in other places." (R530-25-

13

Magistrate's Recommendation); *see also* (R549-2-District Judge's Opinion) (dismissing practices of other prisons as "beside the point"). This was error, for the practices of the vast majority of prisons in this Nation conclusively demonstrate the absence of a compelling interest and the existence of less restrictive means. *Warsoldier*, 418 F.3d at 999; *Spratt*, 482 F.3d at 42.

The American Correctional Association has presumed over four or more decades that inmates will be permitted to wear long hair. *See* PEX 18, ACA Standard 4-4283 ("Freedom in Personal Grooming"). Security expert George Sullivan served on the ACA Standards Committee that reviewed national prison policies and that endorsed continued codification of the presumption permitting unshorn hair. By definition, the Standard governing the practices of corrections' professionals throughout this Nation not only recognizes a less restrictive means to control for Alabama's stated concerns than requiring hair cuts, it provides that the less restrictive means is in fact the *preferred means*. Moreover, despite ADOC's attempt to attribute every hypothetical and imaginable prison risk to unshorn hair, the ACA does not regard hair length as even impinging on the significant prison interests of health, safety, and security. (R476-Tr. III at 72, lns12-25 - excerpt of Sullivan's unmentioned and unweighed testimony).

Plaintiff's Exhibits 22 and 23 reveal the numerous states that regulate

ADOC's hypothetical fears by means less restrictive than forcible hair cuts. The

BOP has operated well-run prisons that do not require hair cuts for decades. The

Defendants have not met their burden to establish that Alabama is uniquely

incapable of operating its prisons while permitting Plaintiffs to wear unshorn hair.

In fact, the sheer multitude of prisons that permit inmates to wear long hair

conclusively demonstrates that Alabama is capable of accommodating Native

American inmates' religious needs. The policies of the other states reflect

numerous less restrictive means to address Defendants' hypothetical and

exaggerated concerns. *See* R471-PEXs 20-55.  Neither the ADOC nor the lower

court considered or weighed any of these policies, each of which reflects the

operational protocols established by corrections professionals experienced in

managing grooming issues.


### C.    The magistrate failed to interpret RLUIPA broadly in favor of religious protection.


 RLUIPA states: "This chapter shall be construed in favor of a broad

protection of religious exercise, to the maximum extent permitted by the terms of

this chapter and the Constitution."  42 U.S.C. §2000cc-3(g).  "The RLUIPA

15

standard poses a far greater challenge than does *Turner* to prison regulations that impinge on inmates' free exercise of religion." *Freeman v. Texas Dep't of Criminal Justice,* 369 F.3d 854, 858 n.1 (5th Cir. 2004). "RLUIPA is to be construed broadly in favor of the inmate*." Putzer v. Donnelly,* 2010 WL 2545566 at *6 (D. Nev. 2010).

Despite ADOC's dearth of knowledge or experience, the magistrate repeatedly deferred  to ADOC testimony or arguments to such an extent as to strip RLUIPA of its compelling interest test.  *See Armstrong v. Davis*, 275 F.3d 849, 874 (9th Cir. 2001), *cert. denied*, 537 U.S. 812 (2002) (prison officials cannot avoid scrutiny even under *Turner* "by reflexive, rote assertions").

Under RLUIPA, prison officials have the burden of demonstrating that the challenged regulation is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. §§ 2000cc-1; 2000cc-5(2) ("the term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion"). "A governmental body that imposes a 'substantial' burden on a religious practice must *demonstrate*, and not just assert, that the rule at issue is the least restrictive means of achieving a compelling governmental interest." *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003) (emphasis in original).

But the lower court did not require that Defendants carry the burden of proof in satisfying the compelling interest test. *Gonzales,* 546 U.S. 418, 126 S.Ct. 1211, 1219 (2006). *Gonzales* explained that the government retains the burden to "demonstrate" that it has a compelling interest that cannot be *furthered* by any less restrictive means. *Id*. at 1219; *see also* 42 U.S.C. §2000bb-1(b) (same). If the evidence is evenly balanced, then the government has failed to carry its burden and the plaintiff prevails. *Gonzales*, 126 S.Ct. at 1218-19 (explaining that when the evidence is "in equipoise, "virtually balanced," or "evenly balanced," the government fails the test).

Instead of imposing the burden to demonstrate on ADOC, the magistrate repeatedly deferred to Defendants' speculative assertions. *See* R530-26 ("The court may not substitute its judgment for that of prison officials."); R549-2 (district court endorses excessive deference). The lower court's functionally lower standard is found nowhere in RLUIPA, *Gonzales*, or any applicable Supreme Court precedent.

Under the reasonableness standard, in contrast, the burden is on prisoners to "point to an alternative that fully accommodates the prisoner's rights at *de*

17

*minimis* cost to valid penological interests" in order to prevail.[3]  But RLUIPA requires prison officials to justify their policies by showing they are necessary to serve a "compelling" interest, while the *Turner/O'Lone* standard, in reality applied below, only requires a valid or legitimate interest.  The court's undue deference to ADOC's unsubstantiated assertions, particularly while failing to weigh or even consider Plaintiffs' empirically-based expert testimony, constitutes error.

### D.    Cases relied upon below are readily distinguished.

The lower court misconstrued *Harris v. Chapman*, 97 F.3d 499 (11th Cir. 1996), to provide an eternal blanket ban on religious hair length exemptions regardless of the evidence.  But RLUIPA claims must be evaluated contextually on a case-by-case basis. Indeed, *Gonzales* rejected the government's view that there was "no need to assess the particulars" and stated that the compelling interest standard was a factually "focused" inquiry rather than a "categorical approach." 126 S. Ct. at 1220. According to *Gonzales*, the government must show with particularity how any "strong interest" would be jeopardized by a less restrictive alternative. *Id*. at 1221 (*citing Wisconsin v. Yoder*, 406 U.S. 205, 236 (1972)); *id*.

---

[3] *Turner v. Safley*, 482 U.S. 78, 91, 107 S.Ct. 2254 (1987).

18

(strict scrutiny "at least requires a case-by-case determination of the question, sensitive to the facts of each particular claim") (*quoting Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872, 899 (1990) (O'Connor, J., concurring in the judgment)).

Rather than conduct a case-by-case analysis, the magistrate found the compelling interest test satisfied by Defendants' "mere invocation of the general characteristics" of hypothetical or potential security concerns with wearing long hair in prison, despite *Gonzales*' admonition that such invocations "cannot carry the day." 126 S. Ct. at 1221. But reliance on *Harris* as foreclosing claims in this case could never be squared with these well settled principles of case-by-case analysis since Harris's attorney was unable to state any less restrictive means to control security interests than an absolute ban. 97 F.3d at 504. The record was so weak in *Harris* that this Court was "unable to suggest any lesser means" than a ban on long hair to satisfy security concerns. *Id. Harris* noted that other courts that had upheld denying hair length exceptions, including *Hamilton v. Schriro*, 74 F.3d 1545, 1554-55 (8th Cir. 1996) (also cited below), were "unable to suggest any lesser means" than a total ban on long hair. 97 F.3d at 504.

Furthermore, defense witness Angelone was somewhat obsessed with potential problems allegedly caused by Rastafarian dreadlocks, and beards, neither

of which concern Native Americans, and one court has squarely held that a prison system may properly prohibit dreadlocks while permitting other inmates to seek religious exemptions. *Johnson v. Collins,* 2009 WL 1543811 (N.D. Ohio June 2, 2009). That is because dreadlocks are different.  And *Harris* itself dealt solely with dreadlocks.

Defendants misplace reliance on *Johnson v. Collins*, 2009 WL 1543811 (N.D. Ohio 2009), a case dealing with a Rastafarian, whose religion raised different hair styles and concerns.  In *Johnson*, the court upheld a prohibition on a Rastafarian inmate wearing long hair even though the State of Ohio permits inmates of other religious backgrounds to wear long hair. PEX 47.   In *Johnson*, the court rejected the Rastafarian inmate's claims based on a nearly (or perhaps completely) identical litany of reasons that have been advanced by Defendants' in this case. The *Johnson* court grounded its decision in the fact that there were "substantial differences in terms of inspection with regard to long hair versus dreadlocks." *Id.* at *6.

Even though the Ohio DOC advanced concerns congruent with the concerns articulated by ADOC, Ohio was able to control for such concerns with regard to inmates who wore long hair but not dreadlocks for religious reasons. This highlights a recurring fallacy in Defendants' thinking and their expert's

Rastafarian-focused testimony: the arguable difficulties and horribles created by dreadlocks are of a different nature and magnitude than the hypothesized problems created by Plaintiffs wearing long hair. After all, dreadlocks are quite unique in that they are interlocked ropes of hair which grow naturally and which are not to be shaved, cut or even combed. Plaintiffs comb their hair, and Angelone even testified that Rastafarians will not wash their hair. Native Americans place a premium on cleanliness and traditionally wash their hair, which Plaintiffs agreed to do. Tr. I, Testimony of Walker.

For similar reasons, this Court's unpublished disposition of a pro se inmate's complaint in *Brunskill v. Boyd*, 141 Fed. Appx. 771, 776 (11th Cir. 2005), is without consequence. Indeed, the Panel that previously remanded this case did not even mention it. (R436). The characterization of the record in these cases and the other cases relied on below, most of which were litigated pro se, cannot compare to the compelling record of less restrictive alternatives Appellants have presented here.

Defendants cannot carry their burden without ignoring the uncontroverted evidence in this case that every federal facility and the vast majority of state prisons adequately address any hypothetical security concerns presented by long hair. *See* 28 C.F.R. §551.4 (Subpart A) (1996) (all prisons in the Federal Bureau of

21

Prisons, regardless of custody level of institution, permit long hair); *see, e.g.,* PEX 5 and Tr. - Sullivan Testimony (long hair has been allowed in numerous well-run state prisons). *See Procunier v. Martinez*, 416 U.S. 396, 414 n.14 (1974) ("the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction"); *Warsoldier,* 418 F.3d at 1000.

The Ninth Circuit's decision in *Warsoldier*, which the lower court could not distinguish, establishes that any hypothetical security concerns can be addressed by less restrictive means. Defendants cannot demonstrate that the myriad of prisons and prison systems that permit the wearing of long hair have decided not to control for Defendants' hypothetical security concerns. Rather, the ubiquity of hair length exceptions reveals that Defendants in fact cannot carry their burden of proof.

**E.  The magistrate erred in not finding the ban on kouplocks to be unlawful.**

22

Defendants have not shown that the wearing of long hair by a handful of Native Americans causes any problem, R471-DEX 16 (providing number of Native American inmates), much less a compelling one that cannot be addressed by less restrictive means. An extreme example of this is that three Plaintiffs, including Plaintiff Billy Jones (who may well remain in prison on a murder charge for life), have stated the spiritual necessity of at least wearing a tiny kouplock. PEX 9 at 4, ¶¶ 2-3 (Interrog. Answers of Jones); PEX 11 at 4, ¶ 2 (Interrog. Answers of Irvin) (requesting kouplock or alternative of hair down his back); PEX 15 at 3, ¶ 4 (Interrog. Answers of Smith) (requesting kouplock). A kouplock is a two-inch wide strip of hair beginning at the base of the skull and stretching down the back. R471-PEX 9 at 4, ¶¶ 2-3. Dr. Walker reviewed the Plaintiffs' Interrogatory Answers, (PEXs 9-16), and after listening to and observing their courtroom testimony in Plaintiffs' case-in-chief, Dr. Walker testified that the individual Plaintiffs' claims to wear long hair were consistent with legitimate Native American practices; were consistent with traditional Tribal practices; and were consistent with pan-Indian religious practices. (R474-Tr. I, Walker Test. at 113, lns 9-19).

There is no showing that Defendants cannot accommodate a kouplock, whose length can be concealed beneath prison clothes. *Odneal v. Pierce*, 2009

WL 901511, *1 (5th Cir. 2009) (remanding for specific findings as to the specific alleged bases for denying a kouplock, described as "a small patch of hair at the base of the skull which symbolizes long hair"); *Benning v. Georgia*, 2012 WL 1862339 (M.D. Ga. May 23, 2012) (ordering GA DOC to permit 3-inch-long religious side-curls). Likewise, the numerous alternative approaches embodied by the regulations of the majority of states and the BOP demonstrate that there are a multitude of less restrictive means to permit long hair short of banning it. Alabama simply needs to choose one of them.

In *Odneal*, the appellate court reversed a ruling that had treated the wearing of a kouploc identically to the wearing of a full head of long hair. 2009 WL 901511, at *3 (5th Cir. 2009). The court noted that very different interests could be implicated by a kouploc, and that therefore, prior Fifth Circuit decisions upholding restrictions on long hair did not dispose of the Native American plaintiff's request to wear a kouplock. *Id.* at *3. On remand, the trial court denied summary judgment, based in part on the testimony of George Sullivan (Plaintiffs' security expert). *Odneal v. Pierce*, 2010 WL 3359535 at *7-*8 (S.D. Tex. 2010).[4]

---

[4]As an apparent compromise between the parties, the TDOC granted Odneal a transfer to a prison system that permitted him to wear his hair in accordance with his religion.

Plaintiff Jones explained that if the Court ruled against him on the wearing of long hair that he (and two others) would wish to wear a kouplock. Jones described this as "a stretch of hair that is two inches wide and would stretch down my back and could be worn inside my shirt except when I am engaging in religious rituals, meetings, or ceremonies. I could tie feathers to it, affix beads, and braid it during and for use in ceremonies." R471-PEX 9 at 4, ¶¶ 2-3 (Interrog. Answers of Jones).  Clearly, there is not one rationale relied upon below that even remotely is implicated by the wearing of a kouplock, except, perhaps, uniformity. *Gonzalez* instructs that uniformity is not a compelling interest and provides no basis on which to ban wearing a kouplock.There is simply no evidence to support the rejection of a kouplock for those who would wear one in the alternative to unshorn hair.

**II.    There are no interests materially furthered by precluding long hair that cannot be protected by a less restrictive means.**


**A.    The finding that inmates were "younger, bolder, and meaner" is irrelevant and clearly erroneous.**

25

The magistrate embraced a catchy, substance-free phrase mouthed by a defense witness. Moseley stated her conclusory, unsubstantiated belief that inmates today are "younger, bolder, and meaner." Moseley cited to no documentation that would support this—no incident reports of increased violence or disturbances, no evidence at all. The "younger" part would also be subject to numerical substantiation, but none was offered. And, it contradicted her testimony that Alabama has done "pretty good" in keeping order. Moseley admitted that she had not "done any comparison to inmates entering other state correctional systems or the federal system." (R475-Tr. II at 38, lns 2-6). Prisoners are "younger, bolder, and meaner" than whom or what? There is no meaningful or pertinent comparison. There is no showing why the same would not be true for inmates in other prison systems, which ADOC did not consider and the lower court deemed "beside the point." (R549-2). Logically, Moseley's comment would also apply to Alabama's women inmates, who remain free to wear long hair.

The recidivism rate has remained generally stable in Alabama, indicating that the inmates are not meaner. The total recidivism rate in Alabama of 27.9% compares favorably to the last rate published by DOJ for 15 states, indicating a 67.5% rate. (R471-DEX 9 at 40). There is no meaningful demonstration that the inmates in ADOC are meaningfully meaner. In addition, all population age groups

26

in ADOC increased with the exception of the young, 21-25 age group, making the claim to "younger" not only irrelevant but also erroneous.  (DEX 9 at 39).

There is certainly no showing that any *Plaintiff* is "younger, bolder, meaner," and in fact, all are considerably older than when the lawsuit began, in varying states of ill health, with two of limited mobility and requiring a cane to walk, and at least three of whom have passed away.  James Limbaugh passed away while on dialysis, with his left foot amputated, unable to walk, and confined to the infirmary, yet ADOC inflexibly refused to permit him a hair length exemption in his dying days.  *See* R471-PEX 10A (Limbaugh Decl. - wrongly not accepted into evidence).  There is simply no substantive evidence supporting the irrelevant assertion that inmates are "younger, bolder, meaner."

## B.    Hair Pulling

Sullivan stated that while fights do occur in prison, in all his years he had not encountered a situation where one inmate grabbed another's long hair to subdue him.  (R475-Tr. II at 124, lns 11-18).  Preventing hair pulling is not a compelling interest, but in any event, Plaintiffs have stipulated that they will hold ADOC harmless for any incident of hair pulling.  (R471-PEX 17; R508-Additional Stipulations of Plaintiffs (attached as PEX B to brief)).  Moreover, implying a violent heckler's veto into the statute is error.  The magistrate's findings that long

27

hair can be dangerous in a fight, and the other constellation of "findings" around this on page 18, are in fact legal conclusions and they are also clearly erroneous. The magistrate approvingly relied on Moseley's testifying that hair could be pulled during a fight, though this non-compelling interest obviously has not motivated ADOC to require its female inmates to wear closely cropped hair.[5]

The magistrate's finding that hair length restrictions allow Defendants "to maintain control, order, and discipline," (R530 at 17-18), is erroneous and contradicted by the record, including especially by Sullivan's unmentioned and unweighed testimony. (*See, e.g.,* R471-PEX 5, *passim*). The magistrate lifted a large quotation from Angelone's testimony as evidence that long hair undermines order, control, and discipline. The block quote suggests that anything that is not uniform, which could be any religious practice, undermines order, control, and discipline. But this has been shown not to be true in ADOC's own prisons, and in any event, runs afoul of *Gonzalez* and the core animating premise of RLUIPA, namely, that prison environments can and must safely and securely accommodate religious differences among inmates, including by making special exemptions for

_____

[5]Defense witness Angelone failed to assist the court. Dabbling in the area of human kinetics, Angelone asserted that an inmate "thrown" by his hair will invariably initially hit either a lock or a wall with his head. (R475-Tr. II at 52, lns 5-8). Angelone, though unqualified to do so, further professed an unsubstantiated medical belief that the pulling of an inmate's hair "shocks them as to what defensive action they want to take with their hands." *Id.* at 52, lns 5-8.

some offenders. Difference does not, by statutory definition, undermine the order, discipline, and control of a facility.  *See* § II.G., *infra* ("Uniformity").

On the same page, (R530-18), the magistrate equates "uniformity" with discipline, order, and control, though, again, the equation undermines the central premises of RLUIPA and constitutional law and cannot be reconciled with *Gonzalez*'s admonition that an asserted interest in uniformity cannot carry a defendant's burden in satisfying the compelling interest test.[6]

## C.    Identification.

There are numerous alternatives to ensure that adequate photographs exist on escape. Computerized digital photographs can be manipulated at any given prison to provide a superior means of identification in the exceptionally unlikely event of escape. Photoshop allows corrections' officials to add hair, cut hair, shave a head, or add facial hair, among other permutations.  *See* (R471-PEX 7A, B, & C) (photographs of Plaintiff Bailey); *see also* (R474-Tr. I at 18-24) (Downes's undisputed testimony describing the quick, easy, straightforward, and inexpensive process of manipulating digital photos with Photoshop).  The availability of this

---

[6]Moreover, the lower court's citations to Culliver's testimony do not support its conclusion, and to the extent that one of the citations does state the magistrate's conclusion, it was a mere conclusory statement without any evidence offered at all.  It was also an answer to a leading question to which Plaintiffs objected.  Tr. I at 148, lns 22-25.

ready technological fix distinguishes this case from prior cases in this Circuit and from cases cited below. Additionally, some other less restrictive means for handling this remote risk are the use of multiple photos, the taking of photos of inmates with both short and long hair, and the like. (Tr.-Sullivan. Test. at 153, lns 1-20).

The testimony of Angelone typifies how unhelpful his purportedly expert opinions proved to be. Angelone stated that short hair facilitated inmate identification because "African American staff find it very hard to get characteristics of other ethnic groups in terms of identifying them," and, he added, whites have a hard time identifying non-whites. (R475-Tr. II at 60, lns 9-15). But he presented no evidence and could cite to no studies supporting his hypothesis of cross-racial identification dysfunction. (Tr. II at 85, lns 18-22). The concern about inmate identification could be compelling only if one accepts Angelone's transparently repackaged view that guards believe that members of other races "all look alike." Such a view mirrors his similarly archaic view on women. *See infra*, §II. I. The magistrate's implicit acceptance of such asserted identification difficulties was error.

What is helpful is to actually examine policies of other prison systems. In Arizona, for instance, inmate identification cards are used to identify inmates.

30

Inmates must be re-photographed when their appearance changes due to "alternation of hairstyles." (PEX 25 at 3 § 1.3.1.1). And updating an inmate identification card does not create the hypothetical administrative burdens ADOC imagines. In Arizona, the inmates' ability to change hair length is itself highly regulated. Arizona inmates are required to "[o]btain approval from the Warden or Deputy Warden prior to a change of appearance, which shall not be granted more frequently than once every six months." (PEX 25 at 4 § 1.3.2) (setting forth the rule and the requirement that inmates pay for the cost of a replacement identification card). There is thus no validity to Mr. Culliver's conjecture that inmates could change appearance frequently. (R474-Tr. I at 163-64). That would be forbidden by regulation.

Arizona also requires that long hair be "worn tied back in a ponytail or bun," (PEX 25 at 2 § 1.3), and stipulates that hair "shall not cover the eyes or ears, and shall be kept clean at all times." (PEX 25 at 1, § 1.1); *see also* PEX 24 at 1 (Alaska "Procedures" § A(4)) (providing that if an inmate changes his hair length, "the individual shall be re-photographed for purpose of identification"); *see* (R474-Tr. I at 160, lns 1-6 (ADOC likewise issues identification cardsand requires individual updates when appearances change)). Plaintiffs have no quarrel with

such requirements,[7] and for any hypothetical non-compliant inmates, disciplinary action is invoked in Arizona as elsewhere. (PEX 25 at 2, § 1.4.2.2).

As to cost, RLUIPA's text states that it "may require a government to incur expenses in its own operation to avoid imposing a substantial burden on religious exercise," 42 U.S.C. § 2000cc-3(c) (RLUIPA). This greatly restricts the ADOC's ability to use cost as a reason not to accommodate religious exercise, and the magistrate's contradiction of this text was in error. Administrative convenience and cost-cutting are not compelling interests. *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 262-63-69 (1974) ("conservation of the taxpayers' purse" held not sufficient under a compelling interest standard); *Frontiero v. Richardson*, 411 U. S. 677, 690-91 (1973) (administrative convenience fails the strict scrutiny standard). Although the Supreme Court has said in dicta that Congress "anticipated that courts would apply [RLUIPA's] standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and

---

[7]Native Americans will wear their hair in any style requested by Defendants, with a number of alternatives set forth in other states' regulations, such as Arizona, where the regulation explicitly requires that hair be kept tied back, and not allowed to hang in front of the eyes or over the ears. PEX 25. Plaintiffs have stipulated that they will wear their hair in any style preferred by the DOC as long as they are not required to cut it. *See, e.g.*, Tr. I at 29, lns 6-14. (Clem); *id.* at *47*, ln 19 - 48, ln 1 (Adams); *id.* at 57, lns 7-13. (Irvin).

discipline, consistent with consideration of costs and limited resources,'" *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (*citing* legislative history), in order to consider administrative and cost issues in RLUIPA cases, they need to be serious. *See, e.g.*, *Shakur v.Schriro*, 514 F.3d 878, 890-91 (9th Cir. 2008) (questioning how large the expense of making Halal or kosher meat available to Muslims would actually be)**.**  Appeals to costs or administrative convenience cannot defeat Plaintiffs claims here.  *Rouser v. White,* 630 F. Supp. 2d 1165, 1185-86 (E.D. Cal. 2009).

Moreover, expert graphic designer Valerie Downes provided without contradiction the only competent testimony offered on the subject.  (R471-PEXs 6-7; Tr. I at 18-24).  It was error to reject her testimony explaining the ready availability and reliability of obtaining and using computerized identification programs, just as it was error to decline to consider Sullivan's testimony. A district court sitting as the finder of fact may not arbitrarily fail to consider expert testimony.  *Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir. 1977).  The lower court arbitrarily disregarded Plaintiffs' expert testimony, failing to mention the extensive testimony of Mr. Sullivan at all.

The magistrate's "findings" to the contrary are clearly erroneous legal conclusions, not supported by the record.  R530-15 (hair restrictions "promote and

33

are necessary" to help officers "quickly and correctly identify inmates"); *id.* at 15,

n.15 (stating that Photoshop presented issues of "cost and training," despite the

uncontradicted expert evidence of Valerie Downes to the contrary). Moreover,

Photoshop can certainly be used for "swift, accurate identification of inmates who

are incarcerated," *id.*, even if that were an issue, which, as Sullivan explained, it is

not. The magistrate erroneously asserted that officers can better identify inmates

when their hair is shorter, but the record citation is incorrect. (R530 at 16)

(mistakenly citing to a "Tr. at 61"). In any event, permitting a hair length

exemption does not undermine inmate identification. *See, e.g.,* (R471-PEX 5,

Report of Sullivan); (R476-Tr. III at 9, lns 4-14 (identification is not a problem

and in any event, inmates can be required to wear long hair pulled back if that is

perceived to facilitate identification)).

## D.    Hygiene, health and sanitation.

Attributing sanitation and health problems to Native American religious

practices has an unfortunate pedigree. Indeed, Alabama's attitude toward

Plaintiffs' hair length exemption harkens back to the repressive federal policies

pursued a century ago when traditional practices were disdainfully viewed as

morally degrading and unhealthy and when Commissioner of Indian Affairs

Charles Burke ordered his staff to punish any Indian engaged in "'any dance

34

which involves ... any disorderly or plainly excessive performance that promotes

... danger to health ....."'"  Barsh, *The Illusion of Religious Freedom for Indigenous*

*Americans*, 65 Or. L. Rev. 363, 370-71 (1986).

The ADOC's and magistrate's stated concerns toward health and sanitation

are especially misplaced with respect to Native Americans, whose religious

practice contraindicates such concerns.  *See* R474-Tr. I-Walker Testimony.

Empirically, the sanitation problems do not exist. "If you require inmates to

shower, … then they're fine."  (R475-Tr. II at 122, ln23 - 123, ln 6-Sullivan

Testimony).

### 1.    The Alaska example.

No ADOC witness or official bothered to consider it, but the State of Alaska

manages any problems with hygiene the way other states do.  It states: "The

Department shall refer to medical staff, prisoners whose grooming and personal

hygiene habits threaten their health or the health of others."  (R471-PEX 24 at 1

("Policy" § B)).  A Native American inmate who refused to comply with the rules

could have his religious exemption revoked and could be required to cut his hair.

With regard to hygiene, showers and bathing facilities are made available at least

three times per week "unless ordered otherwise by facility health care personnel."

PEX 24 at 1 ("Procedures" § B). Moreover, inmates assigned to certain jobs such as "food service, health care services, sanitation, or maintenance must shower daily." PEX 24 at 1 ("Procedures"§ B). The magistrate's conclusion that short hair must be required for health, hygiene, and sanitation, as well as to contain imaginary additional health care costs (R530-19), is clearly erroneous.

The magistrate cited to Moseley's testimony for the false proposition, not supported by the citation, that short hair makes it "easier to detect infections and infestations as well as reduce the spread of infections and infestations." (R530-19)(*citing* "Tr. at 33," on which page Moseley simply asserted without knowledge or basis or relevance that "[c]leanliness…helps keep down infections and other health care issues."). Moseley later testified that "if an inmate has not showered," that "he can be made to shower," and that inmates are permitted to shower "daily." Tr. II at 35, ln 23 - 36, ln 3. There is no competent evidence, and no testimony from any medical administrator or professional, that permitting religious hair length exemptions would contribute to any increase in ADOC's health care costs, much less a significant increase in such costs. There is no showing that institutions in the over 40 other prison systems or at Tutwiler suffer increased infections or health care costs or hygiene difficulties due to permitting long hair. Nor is there any showing that those interests could be shown to be compelling, as required by

36

*Gonzalez* (holding that merely valid interests are not compelling). The magistrate's findings as well as Moseley's testimony are based on erroneous speculation.

When pressed, Angelone for the first time stated that a hair-cut policy was "necessary"—echoing the Court's use of that term—because "the most important thing is the health issue." (R475-Tr. II at 63, lns 15-20). Winging it, Angelone for the first time prioritized and attributed supreme importance to "the health issue," which was barely developed in his report, (R471-DEX 37), and which was deemed valid but not compelling in *Gonzalez*. Moreover, Angelone has no medical or health background and could neither produce nor cite any studies or any evidence that long hair created health concerns uncontrollable by means other than hair cuts. He testified that even with short hair, the concerns he mentioned persisted. Tr. II at 79, lns 14-17. The health issues that he pointed to—"lice and dandruff"—are not even compelling interests, (Tr. II at 64, lns 9-10), and they are controlled in multiple ways in a prison setting that has nothing to do with long or short hair. Further, Angelone admitted that he was unaware of any medical evidence or medical studies to indicate or suggest that long hair impedes tumor detection (Tr. II at 89, lns 13-15), and he had no evidence to indicate that there were fewer lice in prison after his hair policy was implemented. Tr. II at 89, lns 16-23.

37

Angelone later referred to health costs for prisons, but provided no evidence - and was not qualified or competent to do so—that long hair caused health care costs to rise in any prison system, including Virginia. He had neither examined nor done any systematic study of, nor had any idea about, Alabama's health care costs. Tr. II at 87, lns 6-12.  Nor had the magistrate judge, who arrived at his conclusions largely by the improper path of judicial notice.

### 2.    The magistrate improperly invokes judicial notice.

A judicially noticed fact must be one not subject to reasonable dispute and either (1) generally known within the court's jurisdiction or (2) capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned.  F.R.E. 201(b); *see Vester v. Asset Acceptance*, L.L.C., 2009 U.S. Dist. LEXIS 81690, *29 (D. Colo. 2009) (review of judicial notice findings is *de novo*). The magistrate erred by taking judicial notice of "the current economic climate" and "budgetary woes of the State of Alabama," (R530-19, n.20), and further erred by consequently taking judicial notice that "cost containment and health care costs ... are a significant concern in the current economic environment."  *Id.* at 19.

The law disfavors judicial notice because it "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence." *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1205 (11th Cir.

38

2004).  For example, a court may not take judicial notice that a three month suspension of business would cause a person to lose customers and income. *Lawrence v. Commodity Futures Trading Commission*, 759 F.2d 767, 776 n. 17 (9th Cir. 1985) ("Such speculation is not appropriate matter for judicial notice."). Here, there is no competent evidence supporting the disputed judicially noticed facts.

The magistrate erred in imagining health care costs as a compelling interest that was either (1) supported by the record or (2) that could be furthered by no means other than forcible hair cuts.

Indeed the record reveals real reason to believe permitting long hair decreases health care costs. As Sullivan explained, based on his over 50 years in corrections, "personal hygiene and inmate health are not compromised in any way by wearing long hair." PEX 5 at 11, ¶ 13. In fact, to reduce anxiety, depression, aggression, and hostility, it is "healthier for prison safety, security, good order, discipline, health, and hygiene" to permit Native Americans to wear long hair. PEX 5 at 11, ¶ 12. These are real health concerns for Native Americans. Unlike the speculative health risks that the magistrate found and the Defendants imagined, it is "well documented" that the involuntary cutting of long hair has "adverse psychological effects on Native Americans, including by causing depression,

39

anxiety, resentment, anger, hostility, and antagonism." (R471-PEX 2 at 2, ¶7 (Walker Report). The forced cutting of hair actually does create health care problems, as opposed to the hypothetical hygiene problems that have been shown to be unfounded in over 40 prison systems throughout the country.  There were far more probable health risks present in the possible abuse of dangerous drugs that the Supreme Court found *not* to present a compelling interest in *Gonzalez*.

### E.    Preventing Gang Activity.

The magistrate speculated and erroneously found despite the great weight of evidence to the contrary that the "grooming policies enable prison administrators to reduce gang association by requiring all inmates to have short hair."  (R530-16; *id.* at n.16). This was based on incoherent speculation by Ms. Moseley, wherein she offered that if Native American inmates could wear long hair that they might, hypothetically, form a gang.  But Native Americans met regularly on their ceremonial grounds, and if they wanted to form a gang, which no Native Americans at any Alabama facility have ever done, they would not need long hair to do so.  Sullivan's unrebutted yet unmentioned testimony was that in his over five decades managing and auditing prisons, he has never found Native Americans to use long hair, or any other aspect of their religious practice, to participate in gang activity.  (R476-Tr. III at 21, lns 10-22; *see also* R471-PEX 5 at 10, ¶¶ 8-9)

40

(explaining that "engaging in Native American religious practices contraindicates gang activity;" "inmates do not wear long hair to facilitate gang activity [and ] long hair does not cause or further gang activity in prisons.").  Moreover, many of the state regulations that permit inmates to grow their hair have provisions strictly prohibiting signs or symbols or other possible gang insignia to be in the hair.

The speculation about gang activity is an old canard, raised by ADOC to oppose nearly every aspect of Native American religious practice prior to its being permitted per Court Order or agreement. There never has been any evidence of inmates using Native American religion to facilitate gang activity.  ADOC's experience shows that a professional, robust approach to permitting religious practices does not result in gang activity, disorder, resentment or violence. *See* (R471-PEX 60, AR 460) (faith based honor dorms); (R471-PEX 59, AR 333) (religious programs).

### F.    Contraband.

Hair is not a probable location to hide contraband. Sullivan stated: "Given the superiority of other methods of secreting contraband, long hair is neither a reliable nor a plausible vehicle for conveying or secreting contraband. Inmates have so many other superior places to hide contraband that hair is not a likely option."  (R508-PEX A, Sullivan's Response to ADOC's 2006 Staffing Study at 2,

41

¶4).  The magistrate's unsupported findings to the contrary on pages 16-17 are erroneous. Sullivan explained that searching long hair took a matter of seconds, was in effect "instantaneous," and that it took "much longer" to search a Muslim inmate's prayer hat, prayer rug, and Koran than to search a Native American's hair.  (R476-Tr. III at 7, ln 10 - 8, ln 15).

The magistrate hypothesized that there was "an increased likelihood that inmates with long hair could more easily conceal ... weapons ... as well as other types of contraband."  (R530-17).  The magistrate does not cite to the record for support for this conjecture, shown to be erroneous by Sullivan and all the other prison systems that permit long hair, nor is there a citation for the seriatim recitation of other erroneous related findings accompanying this one. The record and great weight of the evidence contradict these findings.  *See, e.g.,* (R474-Tr. I at 168, lns 9-12) (Warden Culliver admits that long hair would not exacerbate contraband issues).  Moreover, the one witness with extensive experience auditing and managing prisons that permit long hair clearly testified that hair was not a plausible vehicle for secreting contraband, and that in any event, searching hair is "essentially instantaneous."  ( Tr. III at 8, lns 1-3; PEX 5 at 10, ¶7) (no empirical evidence suggests that long hair causes problems for prison security, which would include secreting contraband). Furthermore, even if contraband could be hidden in

hair, the risk of this actually occurring is too small to carry the defense burden under *Gonzalez* (dangers must be more than a mere "possibility"). Finally, to the extent any inmate was actually caught with contraband in his hair, he could forfeit his hair exemption just like inmates caught with contraband in their prayer rugs, prayer hats, or holy books might be forced to forfeit their religious items. Such would be an additional deterrent to any attempt to use hair (as opposed to hats, socks, shoes, gloves, pockets, etc.,) to secrete contraband.

Moreover, to the extent that the magistrate found that hair length restrictions "hinder the introduction of contraband into the prisons," there is no evidence for this in the record.[8] Inmates who leave the prisons are strip searched upon return, as are those after contact visits. There is no evidence that long hair would permit more contraband to be "introduced" into the facilities.

In sum, the magistrate's findings are conclusory, erroneous, in conflict with the record, and not in keeping with the RLUIPA standard. The findings seem

_____

[8]Angelone was unable to say whether there was less contraband in Virginia's prisons after implementation of his hair cut policy. At trial, Angelone initially claimed with calculation that there was less contraband after enactment of his hair policy (*id.* at 79, lns 18-23); he was forced to back off that position when confronted with his deposition testimony stating that he did not know whether there was less contraband in the prisons after implementing his hair policy. *Id.* at 80, lns 11-13. Warden Culliver testified that he could not say that a hair-cut policy would reduce the amount of contraband. (R474-Tr. I at 168, lns 9-12).

43

mostly to take the form of "shorter hair is marginally helpful" to some governmental interest. It makes it somewhat easier to identify inmates, makes it somewhat less likely that they will smuggle in weapons, etc. But that, under RLUIPA and *Gonzalez*, that is not enough. The fact that a practice makes some marginal contribution to a government interest is not enough to show that it is the least restrictive means in "furtherance of a compelling governmental interest." Strict scrutiny analysis requires more, and Congress thought that it was codifying that strict scrutiny in RLUIPA. Ultimately, the challenged action must make some real, considerable contribution to the compelling state interest; otherwise something that increases security 0.0001% at enormous cost to religious freedom would pass muster. That result would contravene RLUIPA. The magistrate erred by declining to focus on the *degree* to which the short hair allegedly contributes to the stated interest.

It is also insufficient under RLUIPA to hypothesize, as the magistrate did, the potential troubles that long hair might cause. For instance, the magistrate appeared to assume that it was sufficient to hypothesize that there is a real risk of inmates getting a lice infestation or not keeping their hair clean. But a critical difference between rational basis and strict scrutiny is that in the former, the court can hypothesize a basis for the rule while under strict scrutiny there must be actual

evidence to support the state's judgments. And there was no evidence here or anywhere else for the magistrate's finding on health and hygiene. While the Supreme Court has said that cost may be a consideration, it has not said that a state can refuse to accommodate religious beliefs so long as the accommodation would cost even a small amount of money.  And it has not even suggested that making security, health care, etc., a bit less costly is a compelling interest. Thus, showing that shorter hair may make it slightly easier and less costly to provide security or health care is insufficient as a matter of law for ADOC to meet its RLUIPA burden.

###      G.    Uniformity.

Angelone's testimony that requiring "everyone in a uniformed type look keeps everyone feeling equal," was rejected as not compelling by *Gonzalez.* Moreover, as discussed herein, in numerous ways all of the empirical evidence reveals the stated interest in uniformity to be a penological myth, as Alabama and other corrections' systems routinely permit certain religious groups to enjoy religious rights not enjoyed by other religious groups. As Sullivan testified, permitting religious freedoms has not posed a threat in prison settings.  (R471-PEX5, *passim*).  Moreover, even with regard to the particular practice of permitting hair length exemptions for religious reasons, several state systems

45

permit hair length exemptions for religious reasons. *See* R471-PEX 22-23 (listing New Mexico (PEX 44), New York (PEX 45A-B), Ohio (PEX 47), Pennsylvania (PEX 50A-B), and Wyoming (PEX55); *see also* PEX 22 (citing New Hampshire's religious shaving waiver).  ADOC failed to present sufficient actual evidence to meet their RLUIPA burden, and the magistrate erred in holding otherwise.

**H.      National corrections expert Sullivan, whom the lower court ignored, addressed ADOC's staffing claims, which undermined rather than furthered ADOC's position.**

Demographic information regarding the number of inmates, alleged staffing shortfalls, and funding shortfalls does nothing to relieve ADOC of its statutory duty to permit a religious hair length exemption.  The magistrate listed wholly irrelevant facts related to alleged funding shortfalls and alleged overcrowding that has nothing to do with ADOC's ability to permit long hair.  *See* (R530 at 13-15). It is undisputed that the allegedly overcrowded, underfunded, understaffed, resource deprived women's prisons, including the oldest facility in the entire system (Tutwiler) permit inmates to wear their hair at least to their shoulders, and

many inmates to wear their hair longer than that.[9] Sullivan explained that the ability to accommodate shoulder length hair at Tutwiler demonstrated ADOC could waive hair length requirements in male prisons. He explained, "Any difference in time it would take to search a woman's shoulder length hair and hair that reached farther down one's back would be hardly measurable, if at all." *See* (R508-Attachment to Ps'Trial Reply Brief, PEX A, Sullivan's Response to ADOC's 2006 Staffing Study at 2-3, ¶6).

Sullivan testified that there is no information contained in the ADOC's 2006 Staffing Study, (R471-DEX 52), that supports the position that long hair poses a threat to the safety or security of Alabama's prisons.  (R508-PEX A, Sullivan's Response to ADOC's 2006 Staffing Study at 1, ¶1). He further stated, "There is nothing in the Study that undermines my opinion that ADOC can safely and securely permit male inmates to wear long hair consistent with the safety, security, and good order of Alabama's prisons." *Id.* at 1, ¶1. Sullivan questioned the accuracy and reliability and the concealment of the data underlying the study, but even accepting the study as accurate, Sullivan testified that "the current allocation of correctional officers at various facilities allows conducting searches of

---

[9]This is similar to a situation where some inmates would wear short hair but others, a small number of Native Americans with a religious exemption, would be allowed to wear long hair.

inmates." *Id.* at 1, ¶2. Sullivan testified that "[a]ny hypothetical increase in time of searching long hair over the time required to search short hair is vanishingly small. At most, it would be a few extra seconds." *Id.* at 1, ¶2; see also *id.* at 1-2, ¶3 (describing any increase in time as "barely measurable"); s*ee also Gonzales*, 546 U.S. 418 (2006) (an interest cannot be hypothetical or remote or a mere possibility, but it must be supported by evidence).

Sullivan stated unequivocally and without contradiction that if there are officers who are assigned to search inmates, then there are officers who can easily search inmates' hair without any noticeable increase in time. *Id.* at 1, ¶3. Further, "[i]f there are not officers who can conduct searches of inmates, then inmates will simply carry contraband in their pockets or the myriad other places that would serve as better places to conceal contraband than hair." *Id.* at 2, ¶3.

Sullivan reiterated this important insight from a previous Report: "Conducting a search of an inmate's hair takes no additional staff or resources and is in fact less time consuming than the searches that occur on a daily basis in prison. For instance, inmates can and do hide contraband in body cavities, inside socks, shoes, pockets, coats, the seams and lining of clothing, hats/caps, and the like. These are the places that corrections staff focus on while conducting searches. Hair is readily searched at the same time as any other search is occurring,

48

and can be conducted effectively either by having the inmate run his hands through his hair or having the officer do so. Any contraband would be much more readily discoverable if it were in the inmate's hair rather than somewhere in the inmate's clothing or elsewhere on or in his body. Searches of long hair do not put staff at any increased risk. Again, permitting inmates to wear long hair reduces any risk to staff because it reduces inmate resentment and hostility." *Id.* at 2, ¶5.

After conducting a careful review of DEX 52, including by examining the staffing numbers, Sullivan determined, "If the staffing levels for women do not preclude the wearing of long hair, then the staffing levels for men do not preclude it either." *Id.* at 3, ¶7. This is in part because the "Study" indicated that "Tutwiler needed additional security personnel to a degree comparable to the additional security personnel needed at other institutions." *Id.* at 3, ¶7. There was a "similarity in staff shortages for Tutwiler and some of the male prisons." *Id.* at 3, ¶7. Sullivan added, "Even for prisons with much larger purported staffing needs according to DEX 52, staff shortages such as those purportedly found at Fountain…would not in any way support Defendants' stated need for a hair cutting requirement for men. Alabama is fully capable of safely and securely permitting inmates to wear long hair." *Id.* at 3, ¶8.

49

Sullivan explained the fallacy in making decisions based on the "staff to inmate" ratios ADOC offered and the magistrate erroneously accepted. Without a professional staffing study, staff to inmate ratios are meaningless and "only confuse the issues." (R475-Tr. II at 141, lns 4-17). Moreover, Angelone testified that all institutions of which he is aware except one are facing budget shortfalls and overcrowding.

The magistrate erred by ignoring the fact that the federal BOP has a higher inmate to staff ratio—10.3 to 1—than does Alabama. (R475-Tr. II at 143, lns 13-20). Sullivan is the only witness who has substantial and continuing working experience with the BOP. He has testified that for every Alabama prison, there are two or more federal prisons materially identical to any given Alabama prison. (R476-Tr. III at 25, lns 22-25; *see also id.* at 26, lns 1-9). Those prisons permit inmates to wear long hair. The BOP inmate to staff ratio of 10:1 poses no barrier to permitting the wearing of long hair. Similarly, a number of the exhibits showed that other prison systems, such as California's, which were understaffed and overcrowded in a manner similar to Alabama, nonetheless permitted male inmates to wear long hair. (R471-PEX 64; DEX 33).

As noted, if it would take additional time to search an inmate with long hair—and it would not—this would be *de minimis*. As the Plaintiffs testified, *their hair is already being searched*.

What stands out about DEX 9, and what was error for the magistrate to ignore, is that the State's primary women's facility "exemplifies the problems found at all 14 of Alabama's major correctional facilities—overcrowding, personnel shortages, an aging physical plant, and soaring healthcare costs." (R471-DEX 9 at 11, ¶ 3). Sullivan explained that none of these factors require a forced hair-cutting policy, and this Exhibit reveals that ADOC knows this to be true and that the magistrate's findings that issues such as overcrowding or understaffing might preclude permitting long hair were in error. After all, the women at Tutwiler are exempt from the hair length requirements imposed on men. ADOC is thus not prevented from permitting Plaintiffs a hair length exemption for any of the reasons found by the magistrate. The numbers the magistrate recites on pages 14-15 relating to the number of inmates and various alleged particulars about the population in general were not shown in comparison to other prison systems that permit long hair, and were, therefore, wholly irrelevant. The BOP, which has permitted long hair for everyone for decades, is more overcrowded than ADOC. Moreover, Sullivan testified that there was nothing about ADOC's

population numbers that remotely altered his view that ADOC can safely and securely house Native American inmates with long hair.  (R476-Tr. III at 62).

Relatedly, the magistrate was unable to accurately distinguish the prison for women from those for men. The magistrate stated that Tutwiler housed fewer inmates than the "majority" of ADOC's male prisons, (R530-16, n.17), but ADOC admits that Tutwiler "exemplifies" the problems found at "all 14 of Alabama's major correctional facilities." (R471-DEX 8 at 11, ¶3). For issues related to crowding and staffing, ADOC categorizes Tutwiler the same as it does the male prisons; it is only when it becomes convenient for this lawsuit is there an attempt to classify Tutwiler as drastically different. The magistrate erred in not acknowledging that Tutwiler's occupancy rate (a rough measure of overcrowding) exceeds that of many male facilities, including those where most of the Appellants are housed.  (R471-DEX 8 at 3).

The ADOC attempted to show system-wide difficulties, but never demonstrated that any specific facility could not accommodate a religious hair exemption.  ADOC did not consider or evaluate an alternative offered by the Plaintiffs but not addressed by the lower court - that Native Americans seeking hair length exemptions be permitted to be housed at one of the handful of ADOC's sweat lodge institutions. That would limit the practice to a few facilities, and to the

52

extent overcrowding and staffing were legitimate reasons to require hair cuts, which they are not, ADOC could ensure that the sweat lodge facilities were fully staffed and not overcrowded.

To the extent that the magistrate relied on staffing studies, the reliance was in error. (*E.g.*, R530-18, n.18)**.** Plaintiffs incorporate prior objections made to the staffing study and Defendants's exhibits and testimony, (Doc. 485), into this Argument.  With or without a reliable study, the numbers relied on by the magistrate and/or pulled off a website were meaningless.

Similarly, the magistrate misinterpreted *Brown v. Plata*, 131 S. Ct. 1910 (2011).  *See* (R530 at 20-22 and accompanying discussion).  *Plata* protects an important federal right—the right to adequate medical care—from being infringed by overcrowding. Likewise, a core religious right cannot be trampled because ADOC has failed to keep its prisons up to standards and failed to prevent or rectify overcrowding.

The available RLUIPA rights should not vary according to a jurisdiction's budgeting and overcrowding.  Surely federal law would not permit cutting the ADOC slack in an equal protection challenge to segregated prisons because it was somehow cheaper to run them.  Would the Supreme Court uphold a zoning

decision against building a church because of the loss of future tax revenue? That is hard to imagine.

To the extent that officer positions have been authorized but not filled, ADOC is at fault for failing to fill such positions. Without evidentiary support, the magistrate erred in finding that the ADOC was "unable to" fill vacancies. ADOC has not demonstrated it was "unable" to fill vacancies, only that it had the authorization to do so and failed at doing so.  Indeed, one immediately apparent less restrictive means is to fill all the authorized positions, which ADOC is currently doing.  *See* Montgomery *Advertiser*, "Ala. Prison System Gaining New Officers" at 3B (Aug. 10, 2012) (reporting 225 expected new officer hires in 2012 alone).

It is well settled that a lack of funding is not an excuse for denying rights of a constitutional nature.  *See Laube v. Haley*, 242 F.Supp.2d 1150 (M.D.Ala. 2003) (finding unconstitutional conditions at ADOC's women's prisons and requiring a remedial plan that "assumes the necessary funds will be available, since lack of funds is not a defense to constitutional violations." *Id.* at 1152; *Long v. Robinson,* 432 F.2d 977, 980 (4th Cir. 1970) ("It would seem elementary that a party may not claim equity in his own defaults").  The court noted that the "lack-of-funds defense is common in prison suits, [but] is available to officials only when they are

54

sued in their individual capacities." *Id.* at 1249. Defendants' responses to crowding—increased community corrections programs, increased programs in the prison, staff overtime, inmate counseling, and staffing requests—were commendable but did not go far enough and had "negligible impact on the massive danger posed to inmates…." *Id.* at 1251.

Despite such dangerous overcrowding, ADOC never was concerned with Tutwiler's women wearing long hair, any health issues related to such hair, or any issues regarding imagined increased search time.  This is because requiring shorter hair would not further the interests of safety, security, order, or discipline.

## I.      Permitting women to wear long hair demonstrates ADOC can safely and securely grant a religious hair length exemption.

In *Warsoldier*, the court noted that prison officials failed to explain why it did not restrict hair length at women's prisons as well as men's prisons, since its claimed interests in health and security were just as compelling for women, and the rate of assault among women was not greatly different from that among men. *Id.*; *accord Smith v. Ozmint*, 578 F.3d 246, 253 (4th Cir. 2009) (noting failure to explain why long hair was acceptable at women's prison).

Simply offering dubious testimony grounded in archaic stereotypes of professed differences between men and women cannot carry Defendants' burden. First, the compelling interest test can only be "satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales*, 126 S. Ct. at 1220; *see also* 42 U.S.C. §2000bb-1(b) (compelling interest test can only be met as to a particular "person"). This burden cannot be fulfilled by appeals to broad generalities regarding the differences between male and female inmates.

In this case, no Plaintiff is a maximum security inmate, all are in general population and two are in for property crimes. Second, the record evidence does not indicate Plaintiffs' engaging in any culpable, violent activity while incarcerated in prison. Third, Defendants completely ignore the stark fact that violent female inmates, who have committed murders and may have engaged in violence within prison, are permitted to wear their hair long. (R471- PEX 3 at 2-3) (Admissions). Such irrationality shows that Defendants cannot even show there is a "valid, rational connection" between the prison regulation and the stated security concern, as required by *Turner*.

The fact that Alabama permits women to wear shoulder length hair or longer undercuts Defendants' statements that no less restrictive means are available to it.

56

*Warsoldier*, 418 F.3d at 1000. Defendants may not employ archaic sexist stereotypes to defend its policy as a least restrictive means even when espoused by its expert.    No evidence supported Angelone's or ADOC's bracing stereotypes of women. Angelone stated, "Most females in prison throughout time have had children." *Id.* at 50, lns 5-6. Putting aside that "throughout time" spans an unhelpfully remote period, he did not assert that most women in Alabama prisons had children, or even how that would affect a security calculus. He assumes, apparently, that most men in prison do not have children, though he doesn't know about Alabama and it's hard to guess why this would matter.   He stated that female inmates, presumably in contradistinction to male inmates, "feel disgraced that they let their children down." *Id.* at 50, lns 4-5. Even if that sweeping statement embraces the women incarcerated for killing or assaulting or abusing their children, (*see, e.g.*, Montgomery *Advertiser*, "Alabama Woman Convicted in Son's Burning Death," (July 9, 2009) (describing the capital murder conviction of woman who burned her six-year-old for an insurance payoff but neglecting to note that she will be permitted to wear her hair long for the rest of her life)), there is no plausible reason why that overly broad assertion would render females with long hair more manageable than males with long hair. Yet the magistrate accepted some

form of gender stereotyping to turn a blind eye to the differential treatment of men and women in ADOC's facilities.  (*See* R530 - 16,  n.17).

Angelone also stated, "Historically women throughout time have not been a violent population inside prison walls." *Id.* at 50, lns 2-3. Again, "[h]istorically throughout time" spans a remote and woefully unhelpful period. Moreover, there is no verification that women are non-violent in prison.  (R476-Tr. III, Sullivan Testimony).  Indeed, Moseley's testimony and Defendants' regulations show that in all relevant respects, women must be and are treated like men for security purposes.  (R471-PEXs 67-73). Women and men are treated alike in Alabama as to those security issues that the ADOC in fact takes seriously, but not as to pretend security issues such as hair length.

In every relevant respect, women are treated identically to male inmates. They are classified, kept behind huge fences topped with razor wire, and continuously surveilled by trained officers in towers armed with shotguns. When women leave the facility, they are guarded in the same way as are men. They are restrained and shackled in the same way when taken to court. They are subject to discipline.  There are no separate, watered down security protocols for women. *See* (R471-PEXs 67-73; R475-Tr. II-Moseley Testimony). There is no separate, undertrained, B-Team security force ensuring the security of female inmates;

58

rather, the officers who work in women's prisons are trained in the same manner as are officers who work in male prisons. The key fact is that female inmates and male inmates are under the custody and control of one, unified prison system, and one unified state agency, the Alabama Department of Corrections.

Angelone asserted that women inmates don't escape as often as male inmates. *Id.* at 50, lns 6-7. He does not know whether this is true in Alabama (the Montgomery *Advertiser* reported that Michelle Marie Shannon escaped this year from Birmingham's Community Based Facility for Women). *See* Montgomery *Advertiser,* "Two State Prison Escapees Captured") (Jan. 12, 2012)). But he confesses that women were allowed long hair, pony tails and braids even though *some women* escaped in Virginia. The ADOC has stated that *all* escapes pose real threats, so the fact that some females pose escape risks proves that Defendants have less restrictive means of controlling for this problem than banning long hair. Some female inmates, who cannot be identified prior to an escape attempt, will prove themselves to be escape risks, just like men. They will also prove themselves to be violent, or capable or secreting contraband, just like men. Yet all women are permitted long hair but men are not. This ability to manage women without banning long hair, or really even caring about it, shows that the ADOC prison system can mange men with long hair.

59

Even though women escaped from Virginia's prisons, Angelone said that a short haired woman looked like a "homosexual." *Id.* at 50, ln. 16. For that reason alone, Virginia permitted women to have much longer hair than men. If Virginia could permit a we-like-to-look-straight exemption, it could accommodate a religious exemption for men and women.  As stated before, a concern about escapes gets no traction in a system that maintains digital photos, as Alabama does, (R474-Tr. I at 160, lns 106), with easy access to Photo-Shop.  Indeed, in the digital age, the stated interest in identification does not even rise to the level of a compelling interest, and certainly not of an interest "furthered" by hair cuts.  *See Gonzales,* 126 S.Ct. 1211, 1219 (2006).

The ADOC retains custody of women in prison for murder, for physical assaults and physical attacks, and for other violent crimes. *Id.* at 8, lns 13-20. Women inside the ADOC also act violently and are known to commit physical assaults and physical attacks. *Id.* at 8, lns 21-23.  *See Warsoldier*, 418 F.3d at 1000-01 (discussing data indicating that violence among women inmates is not much less than violence among male inmates).  For some reason, Defendants' stated concern for the purported danger of male inmates' pulling hair during a fight does not apply to women. This is because the ADOC is not actually

concerned about the hypothetical threat of inmates' pulling hair during a fight; rather, that is a feigned concern made up for these proceedings.

Moseley's attitude typifies that of the ADOC, as she believes "women have a different nature from men and should be treated differently." Tr. II, Moseley Test. at 15, lns 4-14. For decades it has been clearly established that this is an improper basis for deciding which practices are permitted in prisons. *See, e.g., Schlesinger v. Ballard*, 419 U.S. 498, 508, 95 S.Ct. 572, 577-78 (1975) (condemning gender-based discrimination based upon "archaic and overbroad generalizations" about women); *Craig v. Boren*, 429 U.S. 190, 208-209, 97 S.Ct. 451, 462-63 (1976) (criticizing the use of statistical evidence offered to prove generalized, stereotypical notions about men and women). By contrast, Sullivan has extensive experience auditing and touring women's prisons; overseeing the construction and design of a women's prison; and supervising several women's prisons. (R475-Tr. II, Sullivan Test. at 127, ln 18 - 128, ln 1). Sullivan testified that granting women the right to wear shoulder length hair demonstrated that the ADOC could safely and securely accommodate the wearing of long hair by male inmates. (R471-PEX 5 at 12, ¶16).

When the ADOC traffics in such serious gender based stereotypes, which ordinarily subjects the government to heightened scrutiny, Defendants in a

61

RLUIPA case have to come forward with more to support their archaic views than simply an assertion that they believe the views to be true. *Warsoldier* rejected less pronounced sex stereotypes than those present here, finding that the differential treatment of men and women in the same prison system demonstrated a less restrictive means of controlling for the prisons' stated concerns.

## III.    Evidentiary Errors Require Reversal.

### A.    The magistrate's failure to weigh or consider the testimony of Plaintiffs' experts requires reversal.

A district court sitting as the finder of fact may not arbitrarily fail to consider expert testimony.  *Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir. 1977); *accord American Milling Co. v. Trustee of Distribution Trust*, 623 F.3d 570, 574 (8th Cir. 2010) (same); *see also Brock v. United States*, 387 F.2d 254, 257 (5th Cir. 1967) (some reason must be objectively present for ignoring expert opinion testimony).  The magistrate committed reversible error by arbitrarily failing to weigh or consider the testimony of Plaintiffs' experts, George Sullivan (security), and Valerie Downes (graphic design).

62

National corrections consultant George Sullivan possesses an extensive background in running, auditing, and inspecting prisons throughout the country, including his extensive experience with Native American inmate religious programs, which is described in his Vita. (PEX 4). When asked whether there was a legitimate safety or security concern to prohibit wearing long hair, Mr. Sullivan testified that there was "none whatsoever." (R471-PEX 5; R183-Sullivan Rebuttal Testimony at 128-29, lns. 1-3 (March 17, 1998)).  The lower court arbitrarily did not mention, weigh, or consider Mr. Sullivan's testimony, even where it was uncontradicted.

Sullivan's testimony has been highlighted herein.  Among other uncontroverted realities, he explained that 40 American prison systems and the BOP permit the wearing of long hair in furtherance of sound correctional practices consistent with the universal interests of safety, security, order, and discipline. (R471-PEX 22-23).  Sullivan explained that wearing long hair presented none of the hypothetical risks Defendants claimed to fear.  (R471-PEX 5; Sullivan Test. passim; see also (PEX 22-23) (grooming survey demonstrating the wide general acceptance of hair length exemptions).

Moreover, it is Defendants' burden to demonstrate what there is about Alabama's correctional system that makes it so incapable of exempting Plaintiffs

from hair length requirements. The Defendants stated that they had success with short hair, but they did not demonstrate why short hair was a necessity whose absence would cause untold turmoil and chaos. In fact, the overwhelming weight of the evidence, including the way that women were permitted to grow long hair in the ADOC and the experiences of myriad state and federal prisons, demonstrated otherwise.

**B.      Plaintiffs' arbitrarily ignored experts prove a RLUIPA violation; ADOC's expert does not assist the court.**

### 1.      ADOC's Experience Deficit.

Angelone admitted that he "could not express a professional opinion" as to whether Alabama is incapable of enacting and implementing a policy that would permit long hair and still provide for the safety, security, and good order of the prisons. Angelone Testimony, Tr. II at 85, lns 9-17. The most that Angelone could say, which is what he stated in his report, was that Alabama was "providing proper and prudent standards by which all incarcerated can live a productive and healthier existence." Tr. II at 54, lns 16-25. *Gonzalez* instructs that this is insufficient. Even unquestionably "valid" interests are not automatically compelling and were held to

fail strict scrutiny. As the magistrate pointed out at one point, at most Angelone testified to his belief that certain wardens found it helpful to have a haircut policy. Tr. II at 63, lns 3-16. This does not show that a hair cut policy is the least restrictive means to achieving any compelling interest.

Angelone has never conducted a formal audit of any prison for which he was not Commissioner, whereas Sullivan has audited over 60 such prisons. Not only has Angelone never audited a federal prison, he has not stepped foot in one in nearly 30 years. Angelone Test. at 61, lns 8-21. He has not been inside a prison in the State of Colorado.  Angelone has only been inside two Alabama prisons, Staton and Draper, and only related to a completely separate matter. Tr. II at 68. He cannot dispute Sullivan's testimony as to these well run facilities. Angelone admits that the administrators in charge of running prison systems in Oregon, Washington, Colorado, and the entire Federal Bureau of Prisons do care about the safety, security, and good order of their prisons. Tr. II at 66, lns. 10-18.

> **2.**    **Angelone could not demonstrate a causal relationship between the purported restoration of order in Virginia's system and his hair cut policy, and could point to no facts suggesting a causal relationship between Alabama's hair cut policy and the good order of its prisons.**

Angelone could say no more than that it was his belief that short hair was "one of the strands in the fabric of safe and secure environments." *Id.* at 51, lns 15-16. But Angelone did not testify, and Defendants cannot demonstrate, that short hair is a necessary, or even a remotely important, strand. Stating, as the magistrate did, that a certain practice, like forced hair cuts, possibly helps protect valid interests is insufficient to meet the ADOC's burden. *See Gonzalez*, 546 U.S. 418, 436 (showing that a benefit is "a possibility" does not meet the defendant's burden). At most, Angelone asserted that forced haircuts helped in some generalized, unverifiable manner to secure a system that had spiraled out of control, into "chaos," in large measure because of practices that were "unheard of" in corrections.

Permitting long hair is not an unheard of correctional practice. Rather, it has been the premise of sound correctional practice for decades. (R471-PEX18, American Correctional Association Standard 4-4283 ("Freedom in Personal Grooming")). The forced cutting of hair, particularly over religious objections, violates widely accepted corrections standards for maintaining well-run prisons, including because, among other things, it breeds resentment and hostility, and in this case, infringes the human need for fulfilling a core religious tenet. *See* PEX 2 at 2, ¶7 (Dr. Walker Report) ("It is well documented that the involuntary cutting of

long hair has had adverse psychological effects on Native Americans, including by causing depression, anxiety, resentment, anger, hostility, and anger in those whose hair is cut.").

Although Angelone announced that his policies reduced violence in Virginia's prisons, he was unable to describe the nature of even one such policy. Tr. II at 75, lns 14-17. It is implausible that the only policy he could point to that allegedly reduced violence in Virginia's prisons was a hair length policy.

> **3.    The violence, riots, and overall chaos permeating the Virginia system are unheard of in the Alabama DOC, rendering the Virginia experience wholly irrelevant.**

When Ron Angelone took over the Virginia DOC, "[t]he *system was in chaos*. There were riots, takeovers of prisons, escapes, murders, assaults going on frequently. *Almost daily* when I got there on May 1st, 1994." Angelone Testimony, Tr. II at 43, ln 25 - 44, ln 8 (emphases added); *id.* at 45, lns 9-25 (repeating and amplifying that "the department was in chaos"); *id.* at 75, lns 23-25 (stating that the Virginia system was totally out of control in ways "too numerous to explain"); *id.* at 76, lns 2-8 (reporting the numerous riots, assaults, and escapes of inmates and recounting that one prison was under inmate control for three entire days).

67

According to Angelone, all of "[t]his is unheard of. Not safe for the different individuals that are housed in that prison, and definitely not safe for the staff that works there." *Id.* at 45, lns 16-23. So, Angelone was forced to "change the whole system, bring in to date new policies and procedures." *Id.* at 45, lns 24-25.  Relatedly, unlike in Alabama, there were no maximum security prisons, and no supermax prisons. *Id.* at 45, lns 13-15.  Virginia then built "eleven work centers, two maximum security prisons, and ... the supermax prisons." *Id.* at 46, lns 7-9. These are the sort of changes that most likely addressed the chaos.

One policy Angelone did not institute was a hair cut requirement—when he arrived at the system of unparalleled chaos, *a hair cut policy was already in effect*. *Id.* at 46, lns 12-13. Angelone now claims that such policy was not being enforced. The likely reason that the policy was not being enforced is that officers had more important things to worry about than hair length. In other words, they had real concerns, not make believe ones that tied hair length to security risks.

Angelone described a systemwide failure of near daily assaults, riots, and other maladies. The system was completely dysfunctional, and most likely fell well below constitutional standards. Alabama's system has never been in such dismal shape. According to Warden Moseley, Alabama does well in managing inmates, and there have not been the riots or other major disturbances seen

elsewhere. Tr. II at 31, lns 15-17 (Moseley has never run an Alabama prison she

thought was disorderly); Tr. II at 38, ln 24 - 40, ln 4 (Moseley's statements that

Alabama is a "model" for other states in terms of discipline and that Alabama has

done "pretty good" in terms of "riots and distrubamces"). There has been no

showing, nor could there be, that Alabama's system is or ever has been anything

remotely as dysfunctional and dangerous as Virginia's system.  Angelone's

experience and testimony was especially irrelevant and unhelpful to the court,

providing no basis to assist the court's decision.

### 4.    Angelone's testimony is unhelpful, and cannot carry ADOC's burden.

Moreover, Angelone has a tendency to exaggerate the success of his

policies, stating that his policies eliminated violence and made Virginia the safest

system in the country. He claimed a willingness to believe a friend who stated

there was *no violence* in Virginia's system. This grandiose claim is so implausible

that if true would no doubt be the subject of massive study by all prison systems in

the Nation and the subject of national news.   Angelone testified to Virginia's

violence-free prisons based on the fact that the newspaper he read did not report

any violence and a friend of his acting as a public information officer told him so.

That sort of testimony is unhelpful to the Court, and insufficient to carry the

69

Defendants' burden that short hair is necessary for order and safety. *id.* at 81, ln 18 - 83, ln 25; *id.* at 83, lns 15-16 (stating he knew there were few assaults "because there was none in the paper").  At the very least, this unhelpful and unreliable testimony enhances the obligation of the magistrate judge to weigh and consider Mr. Sullivan's testimony.

Similarly, Angelone testified that "on two or three occasions at different institutions," (*id.* at 48, lns 4-5), an inmate "set his hair on fire because it hurt so bad and nested in his hair were black widow spiders."  The magistrate stated that this was too "idiosyncratic" a basis on which to ban long hair, but in reflexively accepting and deferring to nearly every conclusory assertion of Defendants, he even relied on this.  (R530 at 19).  Angelone finally admitted on cross, though not without resistance, that there in fact had been just one very troubled inmate who set his hair on fire one time.

With regard to the fixation on the alleged black widow spider, Angelone never saw an incident report—although he calls it a medical report—and heard from a committee that the incident occurred (possibly triple hearsay). Tr. II at 72, lns 11-23. Although Angelone featured this incident in his report, he actually knew nothing about it. He did not know the inmate's medical status or whether he was prohibited from using matches and in fact stated: "You can ask me a million

70

questions about the individual. I have no idea." Tr. II at 72, ln24 - 73, ln 11 (also

admitting that there was only one individual, not several, who had reportedly set

his hair on fire).  The magistrate erred by giving the spider story any weight

whatsoever.  Angelone's testimony was plainly unreliable and unhelpful, and it

was error to arbitrarily refuse to weigh or consider the objectively plausible,

experience-based testimony of distinguished corrections expert George Sullivan.

### C.    The magistrate committed other evidentiary errors.

As described above, the magistrate erred by arbitrarily refusing to weigh or

consider Mr. Sullivan's expert testimony or Ms. Downes's uncontradicted

testimony.  The numerous other evidentiary errors highlighted throughout and on

the record, individually and cumulatively, amount to error requiring reversal.

## IV.    The hair length restrictions violate additional legal rights of Plaintiffs.

The unique legal status of Native Americans supports Plaintiffs' claims.

The special relationship between American Indians and the federal government

gives the wearing of long hair for Native Americans an importance unsurpassed by

any other religious tradition and provides additional protection to core traditional

religious practices of Native American peoples and practitioners.  Given the

recognition of the history of systematic religious oppression practiced against

71

Native Americans, Defendants must permit Indian inmates a religious hair length

exception even if they do not grant such exemption to other religious traditions.

*See* American Indian Religious Freedom Act, 42 U.S.C. §1996; *see also* Federal

Agencies Task Force, Report to Congress on American Indian Religious Freedom

Act of 1978, pp. 1-8 (Aug. 1979) (history of religious persecution).

Although the lower court held that none of Plaintiffs' "constitutional claims

remain before the court," (R530-4, n.4), Plaintiffs have preserved these claims.

The magistrate dispenses of these claims by stating they fail because the RLUIPA

claims fail, and citing *Smith v. Allen*, 502 F.3d 1255, 1264 n.5 (11th Cir. 2007),

which does not compel disqualification of Plaintiffs' Equal Protection, Free

Exercise, Freedom of Association, Establishment Clause, §1985 conspiracy, and

Due Process claims, including on the basis of sex, religion, and race, given that

women are not subjected to the long litany of stereotypes about men that animates

ADOC's position.  Gender-based discrimination, even in the prison context, is

unconstitutional. *West v. Virginia Dept. of Corrections*, 847 F. Supp. 402, 405

(W.D. Va. 1994) (pilot boot camp programs cannot be provided only to male

inmates solely on basis that problems are more pressing in male prisons and it is

more cost-effective to solve those problems) (*citing Clark v. Jeter*, 486 U.S. 456,

461 (1988)).  Additionally, Plaintiffs are treated differently on the basis of religion

and ethnic identity/race.  Given the magistrate did not address the non-RLUIPA claims, a remand of RLUIPA claims would preserve a remand of the constitutional claims.

ADOC violated clearly established principles, including of the equal protection clause, *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 107 (1972), warranting monetary damages.   Plaintiffs incorporate by reference arguments from previous submissions as to these claims.  *See* (R539 at 92-106).

## CONCLUSION

Because ADOC failed to meet its RLUIPA burden, Appellants seek reversal requiring recognition of a Native American hair length exemption, or in the alternative, a remand for ADOC to actually consider and evaluate available alternative policies and procedures.

Respectfully submitted this the __20th_____ day of August, 2012.


/s/ Mark Sabel_____
MARK SABEL, SAB004
Attorney for Appellants

OF COUNSEL:
Sabel Law Firm, L.L.C.
P.O. Box 231348
Montgomery, AL 36123

Phone: (334) 546-2161

Fax: (334) 819-7051

E-Mail: MkSabel@mindspring.com


_____

PETER FRUIN

Attorney for Appellants

OF COUNSEL:

Maynard, Cooper & Gale, P.C.

201 Monroe St., Suite 1940

Montgomery, AL 36104

(334) 262-2001

## CERTIFICATE OF COMPLIANCE

This is to certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B), as extended by Court order entered on August 14, 2012.  This brief contains up to 16,000 words.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above has been served upon the following listed persons by placing same in the Unites States mail, first class, postage prepaid, on this the __20th__ day of August, 2012:

> Joe Steadman, Esq.
> 4087 Cottage Hill Rd.
> Mobile, AL  36609
>
> Attorney for Defendants
>
> George Beck,
> United States Attorney, Middle District of Alabama
> James J. Dubois, Assistant United States Attorney
> Post Office Box 197
> Montgomery, AL 36104
>
> Thomas E. Perez, Assistant Attorney General
> Civil Rights Division
>
> Assistant Samuel R. Bagenstos, Principal Deputy Assistant
> Attorney General
> Civil Rights Division
>
> Timothy D. Mygatt (PA Bar #90403)
> Amin Aminfar (NC Bar #36589)
> Deena Fox (DC Bar #992650)
> U.S. Department of Justice

76

Civil Rights Division

950 Pennsylvania Avenue, N.W.

Washington, DC 20530

Attorneys for the United States


  /s/ Mark Sabel

OF COUNSEL